NOTTELSON, Plaintiff-Appellant, V. DEPARTMENT OF INDUSTRY, LABOR & HUMAN RELATIONS, and another, Defendants-Respondents.

Supreme Court

*No. 77–285. Argued November 6, 1979.—Decided February 7, 1980.*
(Also reported in 287 N.W.2d 763.)

For the appellant there was a brief by *Keith R. Clifford* of Madison, and *Lee Boothby* of Berrien Springs, Michigan, and oral argument by *Mr. Boothby*.

For respondents there was a joint brief by *Uclair W. Brandt,* director, and *Barry M. Levenson,* attorney, Bureau of Legal Affairs; and *Sigrid E. Dynek,* assistant general counsel, A. O. Smith Corporation, of Milwaukee, and oral argument by *Mr. Levenson,* of Madison, and *David C. Sullivan,* of Milwaukee.

SHIRLEY S. ABRAHAMSON, J. This appeal is from a judgment of the circuit court affirming a decision of the labor and industry review commission (commission) of the Department of Industry, Labor, and Human Relations (department) denying unemployment compensation to Darrel C. Nottelson, the claimant. We reverse the judgment and remand the matter to the circuit court with directions to remand the record to the department for further proceedings consistent with this opinion. Secs. 102.24(1) and 108.09(7), Stats.

## I.

The following facts appear in the findings of the commission and the undisputed evidence. The claimant began his employment with A.O. Smith Corporation on October 30, 1947 and was discharged on July 11, 1975. For many years prior to claimant's discharge, A.O. Smith had been a party to collective bargaining agreements which contained union security clauses requiring employees of A.O. Smith to join the union and to pay union dues as a condition of employment.[1]

In 1966 claimant became a member of the Seventh Day Adventist Church, which includes as part of its teachings the tenet that its members not join or financially support a labor union or similar organization. On January 1, 1975, claimant stopped paying his union dues on the ground that his religious beliefs prevented him from being a member of the union or financially supporting the union. There is no question that the claimant was a good and valued employee and that he was sincere in his religious beliefs.

Between December 1974 and July 1975 claimant met with representatives of the union and A.O. Smith in an attempt to retain his employment without being required to pay union dues. He suggested to his union, Smith Steel Workers, Local 19806, that he "pay a non-religious, non-union charity the sum equal to [his] union dues."[2]

[1] Article I(B)(2) of the collective bargaining agreement in effect at the time claimant was discharged provided:

"Each employee hired or rehired on or after April 1, 1947, if retained in the employment of the company, shall no later than thirty (30) days after date of hire or date of execution of this Agreement, whichever is the later, become and remain a member in good standing in said labor organization as a condition of continued employment." Collective Bargaining Agreement between A. O. Smith Co. and Smith Steel Workers, Art. I(B)(2).

[2] This plan is commonly known as a "charity substitution," and has been construed to be a "reasonable accommodation" required of

The executive board of the union twice rejected this proposal and expelled him from the union for non-payment of dues. On April 15, 1975, the union sent A.O. Smith a list of over 100 employees who were expelled from the union because of non-payment of dues. The claimant was the only person on the list who based his non-payment of dues on religious grounds.

The claimant also met with company personnel in 1975 in an attempt to resolve his dilemma. There is nothing in the record to show that A.O. Smith made any effort to talk with the union about the claimant or that A.O. Smith took any steps to aid or support the claimant's efforts to continue employment.

The claimant testified that he was told by A.O. Smith that he would be fired if he did not pay the union dues; that he had "made inquiry" about his legal rights; and that he believed that the union security clause of the collective bargaining agreement could not be applied to him because of his religious convictions and that he could not lawfully be discharged. In May, 1975, an A.O. Smith personnel manager advised the claimant that he was to be discharged.

In March, 1975, the claimant filed a grievance with the United States Equal Employment Opportunity Commission (EEOC). In April, 1975, the claimant obtained a temporary restraining order from the federal district court in the eastern district of Wisconsin preventing his discharge by A.O. Smith. On July 3, 1975, the EEOC found "reasonable cause" to believe that both A.O. Smith and the union had discriminated against the claimant on the basis of his religion in violation of Title VII of the

unions under 42 U.S.C. 2000e(j). *See, e.g., Wondzell v. Alaska Wood Products, Inc.*, 583 P.2d 860, 20 F.E.P. 509, rev'd 20 F.E.P. 514 (Alaska 1979); *Tooley v. Martin-Marietta Co.*, 476 F. Supp. 1027, 20 F.E.P. 1487 (D. Ore. 1979).

Civil Rights Act of 1964,[3] as amended in March, 1972. On July 10, 1975, the federal district court denied claimant's request for a preliminary injunction preventing his discharge because claimant had not exhausted his federal administrative remedies.[4] Immediately after this federal district court decision, on July 11, 1975, A.O. Smith discharged the claimant for his failure to pay union dues.

The record is clear that the claimant did not want to quit his employment and that he resisted being discharged.

After his discharge from employment by A.O. Smith Corporation, the claimant sought unemployment compensation. Initially the department allowed claimant's claim for unemployment compensation, and he received $1,582.00. A.O. Smith requested review of this initial finding by an appeal tribunal of the department. Sec.

---

[3] Upon finding reasonable cause the EEOC attempts informal conciliation to eliminate the illegal practice.

Claimant was advised on July 21, 1975, that the EEOC's conciliation efforts had failed and that he had a right to sue the employer and the union in federal court. If the court finds a violation, it may enjoin the unlawful practice, and order appropriate "affirmative action," such as reinstatement of the employee with or without back pay or any other "appropriate" equitable relief. 42 U.S.C. sec. 2000e-5(g). *See* Annot., *Necessity and Sufficiency of Conciliation Proceedings By Equal Employment Opportunity Commission as Prerequisite to Bringing Civil Action*, 5 ALR Fed. 334 (1970); Annot., *Award of Back Pay In Suit Under Title VII of Civil Rights Act of 1964*, 21 ALR Fed. 472 (1974).

[4] *Nottelson v. A. O. Smith Co.*, 397 F. Supp. 928 (E.D. Wis. 1975).

The plaintiff's suit for damages and injunctive relief based on a claim of denial of rights under Title VII and the federal constitution were pending at the time of oral argument of the case at bar. *Nottelson v. A. O. Smith Co.*, 423 F. Supp. 1345 (E.D. Wis. 1976). On December 7, 1979, the federal district court for the eastern district of Wisconsin rendered judgment for the plaintiff on his claim under Title VII.

108.09, Stats. In deciding that the claimant was not entitled to unemployment benefits and was required to repay the sums he had previously received, the appeal tribunal concluded that claimant's failure to pay union dues on religious grounds constituted a voluntary termination of "his employment within the meaning of section 108.04 (7) of the statutes, and that such termination was not with good cause attributable to the employer within the meaning of section 108.04 (7) (b) of the statutes, or within any other exception to section 108.04 (7) (a) of the statutes." The claimant then sought review of the appeal tribunal decision, and the commission affirmed the appeal tribunal's denial of benefits. Sec. 108.09 (6), Stats. The claimant then sought judicial review. Sec. 108.09 (7), Stats. The circuit court affirmed the commission's decision and judgment was entered denying unemployment compensation benefits to the claimant and ordering the claimant to repay the sum of $1,582 to the unemployment reserve fund.

## II.

We turn first to the scope of judicial review of the commission's determination. Sec. 108.09 (7), Stats., provides that judicial review under chapter 108 is confined to questions of law, and that the provisions of chapter 102, Stats., with respect to judicial review of orders and awards apply to any decision of the commission reviewed under sec. 108.09 (7).[5] Sec. 102.23 (1), Stats., provides

[5] Sec. 108.09 (7), Stats.:

"(7) JUDICIAL REVIEW. (a) Either party may commence judicial action for the review of a decision of the commission under this chapter after exhausting the remedies provided under this section if the party has commenced such judicial action in accordance with s. 102.23 within 30 days after a decision of the commission is mailed to a party's last-known address.

that "[t]he findings of fact made by the commission acting within its powers shall, in the absence of fraud, be conclusive," and sec. 102.23 (1) (d), Stats., states that an order or award of the commission or a judgment rendered thereon "shall be set aside only upon the following grounds:

"1. That the commission acted without or in excess of its powers.

"2. That the order or award was procured by fraud.

"3. That the findings of fact by the commission do not support the order or award."

Sec. 102.23 (6), Stats., further states:

"(6) If the commission's order or award depends on any fact found by the commission, the court shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact. The court may, however, set aside the commission's order or award and remand the case to the commission if the commission's order or award depends on any material and controverted finding of fact that is not supported by credible and substantial evidence."

It is axiomatic that the commission's findings of fact are conclusive on appeal so long as they are "supported by credible and substantial evidence," sec. 102.23 (6), Stats., and that any legal conclusion drawn by the com-

"(b) Any judicial review under this chapter shall be confined to questions of law, and the provisions of ch. 102 with respect to judicial review of orders and awards shall likewise apply to any decision of the commission reviewed under this section. In any such judicial action the commission may appear by any qualified attorney who is a regular salaried employe of the department and has been designated by it for this purpose, or at the commission's request by the department of justice.

"(c) If, as a result of judicial review of a commission decision denying an employe's eligibility for benefits, it is finally determined that benefits are payable, they shall be calculated as of the date of the commission's decision."

mission from its findings of fact is subject to judicial review. We have often stated that the court is not bound by the agency's determination of a question of law.

The parties agree that the issue on appeal is whether the claimant should be denied unemployment compensation benefits on the ground that he voluntarily terminated employment without good cause attributable to the employing unit. This issue presents three questions: (1) What was the conduct of the employee and the employer; (2) what is the meaning of the legal concepts "voluntary termination" and "good cause attributable to the employing unit" as used in sec. 108.04(7)(a), (b), Stats.; and (3) did the conduct of the employee constitute "voluntary termination" and did the conduct of the employer constitute "good cause attributable to the employing unit" as those statutory terms have been interpreted.

For purposes of the scope of judicial review, the first question, concerning the conduct of the employee and employer, has traditionally been viewed as a question of fact,[6] and the second question relating to the meaning of the statute has been viewed as a question of law. One of the most troublesome issues in administrative law is determining whether the third question, namely, the application of a statutory concept to a concrete fact situation, should be treated as a question of fact or of law for purposes of judicial review.[7] In many cases we

---

[6] *Cheese v. Industrial Comm.*, 21 Wis.2d 8, 15, 123 N.W.2d 553, 557 (1963).

[7] *See* 4 Davis, *Administrative Law Treatise* ch. 30 (1958 and supplements); Davis, *Administrative Law Text* ch. 30 (3d ed. 1972); 2 Cooper, *State Administrative Law*, 665–667, 706–722 (1965); Jaffe, *Judicial Control of Administrative Action*, 548, 556–564 (1965); Brodie & Linde, *State Court Review of Administrative Action: Prescribing the Scope of Review*, 1977 Ariz. St. L.J. 537; Hewitt, *The Scope of Judicial Review of Administrative Agency*

have said that the determination of whether the facts fulfill a particular legal standard is a question of law.[8] The conclusions that there is a "voluntary termination" or that "good cause attributable to the employing unit" exists are drawn from the underlying findings of fact, and we label them legal conclusions.[9]

Nevertheless, merely labeling the question as a question of law and labeling the commission's determination

---

*Decisions in Wisconsin,* 1973 Wis. L. Rev. 554; Haferman, *Judicial Review of Workmen's Compensation Cases,* 1973 Wis. L. Rev. 576; *McPherson v. Employment Division,* 285 Ore. 541, 591 P.2d 1381 (1979).

One commentator wisely observed: "[W]hether ·a particular question is to be treated as a question of law or a question of fact is not in itself a question of fact, but a highly artificial question of law." Isaacs, *The Law and the Facts,* 22 Colum. L. Rev. 1, 11–12 (1922).

[8] *Dept. of Revenue v. Milwaukee Refining Corp.,* 80 Wis.2d 44, 48, 257 N.W.2d 855 (1977); *Consolidated Const. Co., Inc. v. Casey,* 71 Wis.2d 811, 816, 238 N.W.2d 758 (1976); *Abendroth v. ILHR Dept.,* 69 Wis.2d 754, 765, 233 N.W.2d 343 (1975); *Kress Packing Co. v. Kottwitz,* 61 Wis.2d 175, 179, 212 N.W.2d 97 (1973); *Milwaukee Co. v. ILHR Dept.,* 48 Wis.2d 392, 399, 180 N.W.2d 513 (1970); *Gelencser v. Industrial Comm.,* 31 Wis.2d 62, 64, 141 N.W.2d 898 (1966); *Cheese v. Industrial Comm.,* 21 Wis.2d 8, 15, 123 N.W.2d 553 (1963); *Pabst v. Dept. of Taxation,* 19 Wis.2d 313, 322, 120 N.W.2d 77 (1963).

We have also characterized "the application of undisputed facts to the terms of a statute" as a mixed question of fact and law and a "factual conclusion." *Sauerwein v. ILHR Dept.,* 82 Wis.2d 294, 300, 262 N.W.2d 126 (1978). *See* Hewitt, *The Scope of Judicial Review of Administrative Agency Decisions in Wisconsin,* 1973 Wis. L. Rev. 554, in which the author analyzes numerous Wisconsin cases and concludes that the case law is replete with conflicting standards of review when the administrative agency's determination rests on the application of statutory terms to the particular fact situation.

[9] Other courts have reached this conclusion, *see, e.g., Taylor v. Unemployment Comp. Bd. of Rev.,* 378 A.2d 829, 830–832 (Pa. 1977); *State ex rel. Dept. of Labor v. Unemployment Ins. Appeal Bd.,* 297 A.2d 412, 414 (Del. Super. 1972).

as a conclusion of law does not mean that the court should disregard the commission's determination. Determination of voluntary termination or good cause attributable to the employing unit calls for a value judgment, and judicial review of such a value judgment, though a question of law, requires the court to decide in each type of case the extent to which it should substitute its evaluation for that of the administrative agency.[10] We have recognized that when the expertise of the administrative agency is significant to the value judgment (to the determination of a legal question), the agency's decision, although not controlling, should be given weight. *Milwaukee Co. v. ILHR Dept.*, 48 Wis.2d 392, 399, 180 N.W. 2d 513 (1970).

As we shall discuss later, this case raises for the first time the application of the state unemployment compensation act to a fact situation which involves the interplay of an employee's and employer's rights and obligations under a union security agreement and the federal civil rights act. It appears that the commission has not developed expertise or a body of precedent on this question. Indeed the commission failed to consider the implications of the federal civil rights act in making its determination. For these reasons, we shall not defer to the commission's evaluation of whether the conduct of the employee constituted "voluntary termination" and whether the conduct of the employer constituted "good cause attributable to the employing unit." Accepting the facts as found by the commission, we are of the opinion that they do not

---

[10] *Dept. of Revenue v. Smith Harvestore Products*, 72 Wis.2d 60, 66, 240 N.W.2d 357 (1976). In several cases where the agency's determination represents a reasonable formulation and application of the statute, this court has accepted the agency's determination irrespective of whether there may have been some other reasonable interpretation or application. *Gelencser v. Industrial Comm.*, 31 Wis.2d 62, 69, 141 N.W.2d 898 (1966) (concurring opinion and cases cited therein).

support the conclusion of law reached by the commission that the claimant "voluntarily terminated" employment.

### III.

The applicable law governing payment of unemployment compensation is sec. 108.04(7), Stats., which states the general rule that an employee who voluntarily terminates his employment with an employing unit is ineligible for benefits. One exception to this rule is that the employee may get benefits if he voluntarily terminates his employment with good cause attributable to the employing unit.

"108.04 . . .

"(7) **Voluntary termination of employment.** (a) If an employe terminates his or her employment with an employing unit, the employe shall be ineligible for any benefits for the week of termination and thereafter until he or she has again been employed within at least 4 weeks and has earned wages of at least $200, except as otherwise provided in this subsection.

". . .

"(b) Paragraph (a) shall not apply if the department determines that the employe terminated his employment with good cause attributable to the employing unit."

The meaning of the statutory terms "voluntary termination" and "good cause attributable to the employing unit" has been developed by case law.

We have said that although the word "voluntary" appears only in the caption to sec. 108.04(7)(a), sec. 108.04(7)(a) must be read as if the word "voluntary" is part of the body of the section.[11] Thus we have read

---

[11] "Actually, the word 'voluntary' does not even appear in the body of sec. 108.04(7)(a), Stats., but only in the title to that subsection. Under sec. 990.001(6), Stats., '[t]he titles to subchapters, sections, subsections and paragraphs of the statutes are not part

the statute to say that an employee who *voluntarily* terminates his employment is ineligible for benefits unless he or she falls within a statutory exception. We have further explained that the statutory concept of "voluntary termination" is not limited to the employee who says, "I quit." "Voluntary termination" under the statute can encompass a situation in which the employer discharges the employee. In the instant case the plaintiff did not say he quit; he was discharged by the employer.

The applicable test to determine whether a discharge constitutes a "voluntary termination" was set forth by this court in *Dentici v. Industrial Comm.*, 264 Wis. 181, 186, 58 N.W.2d 717 (1953), and reaffirmed in *Fish v. White Equipment Sales & Service, Inc.*, 64 Wis.2d 737, 745, 221 N.W.2d 864 (1974), and *Hanmer v. ILHR Department*, 92 Wis.2d 90, 94, 284 N.W.2d 587 (1979), as follows:

" '. . . When an employee shows that he intends to leave his employment and indicates such intention by word or manner of action, or by conduct, inconsistent with the continuation of the employee-employer relationship, it must be held, . . . that the employee intended and did leave his employment voluntarily . . .' [case cited]."

This court has also had occasion to interpret the phrase "terminated his employment with good cause

of the statutes.' Thus, it is initially arguable that the statute does not even require that the employment be 'voluntarily' terminated, but only that it be terminated by the employee. Since, however, the use of the word in the title to the statute must be viewed as at least manifesting legislative intent as to its meaning, and since also we have so construed it on prior occasions, *Dentici v. Industrial Comm.* [264 Wis. 181, 58 N.W.2d 717 (1953)] and *Fish v. White Equipment Sales & Service, Inc.* [64 Wis.2d 737, 221 N.W.2d 864 (1974)], we continue to do so here." *Hanmer v. ILHR Dept.*, 92 Wis.2d 90, 94 n. 3, 284 N.W.2d 587 (1979).

attributable to the employing unit." Sec. 108.04(7)(b), Stats. "Good cause attributable to the employing unit" means some act or omission by the employer justifying the employee's quitting; it involves "some fault" on the part of the employer and must be "real and substantial." *Kessler v. Industrial Comm.*, 27 Wis.2d 398, 401, 134 N.W.2d 412 (1965). *See also, Hanmer v. ILHR Dept.*, 92 Wis.2d 90, 98, 284 N.W.2d 587 (1979).

## IV.

The question for this court in the case at bar is whether the facts fulfill the legal standard: did the plaintiff's conduct of failing to pay union dues amount to a voluntary termination and, if so, did A. O. Smith's conduct constitute "good cause attributable to the employing unit."

The commission concluded that the facts establish that the termination was voluntary and that the voluntary termination was not with good cause attributable to the employing unit. A. O. Smith maintains that the commission correctly applied the *Dentici* test to the facts of this case and correctly decided that the claimant, by failing to pay dues while knowing that union membership was a condition of continuing employment, engaged in conduct which was inconsistent with the continuation of the employee-employer relationship and therefore constituted a voluntary termination. A. O. Smith cites numerous cases which hold that an employee's failure to join a union or to pay union dues, absent an excuse, amounts to a voluntary termination of employment where employment is conditioned on union membership.[12]

---

[12] *O'Donnell v. Unemployment Comp. Bd. of Review,* 173 Pa. Super. 263, 98 A.2d 406 (1953); *In re Malaspina's Claim,* 309 N.Y. 413, 131 N.E.2d 709 (1956); *Butler v. Unemployment Comp. Bd. of Rev.,* 189 Pa. Super. 605, 151 A.2d 843 (1959); *Grant Building,*

In the case at bar, however, claimant had an excuse for failing to pay his dues—namely that his failure to pay dues arose from his religious convictions and that the federal civil rights act protected him from discharge. We hold that the meritoriousness of his excuse—that is whether his religious beliefs as protected by the federal civil rights act relieved him of his obligation to pay dues —has to be considered in determining whether he intended to leave his employment and whether his conduct was inconsistent with continuing the employment relation.

The commission treated the case at bar as if there could be no justifiable excuse for non-payment of dues if the employee was aware that he was required to pay dues and that the penalty for non-payment was discharge. The commission recognized that public policy supports requiring workers to belong to the union for collective bargaining purposes but gave no consideration whatever to the effect of the federal civil rights act on this provision of the collective bargaining agreement. The commission treated the matter as if the bargaining agreement required, without exception, that the claimant pay dues; that it gave the union an absolute right to require payment of dues and to demand discharge of a non-paying employee; and that it did not give A. O. Smith any alternative but to discharge the claimant. We conclude that the commission's view of the rights and obligations of the claimant, the union, and A. O. Smith is erroneous. The commission failed to consider the effect of claimant's religious convictions and of the federal civil rights act on the requirement that he pay union dues.

*Inc. v. Unemployment Corp. Bd. of Rev.*, 208 Pa. Super. 280, 224 A.2d 647 (1966); *Amuchastegui v. Dept. of Employment*, 4 Or. App. 456, 479 P.2d 526 (1971); *State ex rel. Dept. of Labor v. Unemployment Ins. Appeal Bd.*, 297 A.2d 412 (Del. Super. 1972).

The record establishes that the claimant's justification to support his position at the time of the discharge that be could, at one and the same time, maintain his job and not pay union dues because he was protected from discharge by Title VII of the Civil Rights Act of 1964, as amended, was meritorious.

The claimant relied on Title VII of the Civil Rights Act of 1964, as amended, which makes it an unlawful employment practice for an employer to discharge an individual or to otherwise discriminate against an individual with respect to the terms of employment because of the individual's religion and makes it unlawful for a union to cause an employer to discriminate against an individual in violation of the law.[13] The act defines religion as follows:

"The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." Sec. 701(j)

[13] Sec. 703 of Title VII of the Civil Rights Act of 1964, as amended in 1972, 42 U.S.C. sec. 2000e–2 provides:

"**Unlawful employment practices**

"(a) Employer practices. It shall be an unlawful employment practice for an employer—

"(1) . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . ."

". . .

"(c) Labor organization practices. It shall be an unlawful employment practice for a labor organization—

"(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his . . . religion,

. . . .

". . .

"(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

of Title VII of the Civil Rights Act, as amended in 1972, 42 U.S.C. sec. 2000e(j).

The intent and effect of the definition of religion in the act is clear: it is an unlawful employment practice for an employer not to make reasonable accommodation for the religious practices of employees, short of incurring undue hardship. The language and the legislative history of the statute show Congress' emphasis on eliminating discrimination in employment based on religion and other impermissible classifications. *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–431 (1971); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71 (1977). However, the federal civil rights act does not provide guidance for determining the degree of accommodation required in any particular case. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. at 74, 75.

Prior to claimant's discharge at least one federal court of appeals had held that union security agreements are subject to Title VII of the Civil Rights Act and that the question in such a case is whether the employer and union could make a "reasonable accommodation" to the particular employee's religious beliefs "without undue hardship." *Yott v. North American Rockwell Corp.*, 501 F.2d 398, 403 (9th Cir. 1974). *See also Cooper v. General Dynamics Convair Aerospace Div.*, 533 F.2d 163, 168, *cert. denied* 433 U.S. 908 (5th Cir. 1976); *McDaniel v. Essex Int'l, Inc.*, 571 F.2d 338 (6th Cir. 1978); *Burns v. So. Pac. Trans. Co.*, 589 F.2d 403, 405 (9th Cir. 1978); *Anderson v. General Dynamics Convair*, 589 F.2d 397, 401 (9th Cir. 1978).

The record does not show any effort on the part of A. O. Smith to accommodate claimant's religious beliefs. There is no evidence that A. O. Smith interceded with the union on claimant's behalf or took any other steps to explore the possibility of aiding the claimant's claim.

On the basis of the record, apparently A. O. Smith took the position that it had no choice but to discharge the claimant.

This is not a case, as A. O. Smith would have us believe, which presents a conflict between the employee and the union with the employer standing innocently in the middle. At the time of claimant's discharge the federal law had been interpreted to impose a burden on the employer to make an effort to accommodate the employee's religious beliefs and, if unsuccessful, to demonstrate that it is not able to accommodate without undue hardship.

Prior to claimant's discharge the EEOC issued a determination on claimant's allegation that A. O. Smith was discriminating against him on the basis of his religion by attempting to enforce the union security clause. The EEOC concluded that although union security clauses in collective bargaining agreements are not a violation of Title VII, the enforcement of sanctions associated with such clauses against employees who object on religious grounds to union membership or to payment of dues, constitutes a violation of Title VII, absent a showing of undue hardship or business necessity. The EEOC concluded that there was reasonable cause to believe that A. O. Smith's impending discharge of claimant constituted an unlawful employment practice. The EEOC invited the union and A. O. Smith to join with the EEOC in a collective effort toward a just resolution of the matter.

Considering the language and legislative history of the federal Civil Rights Act, the judicial interpretations of the Act, the EEOC determination in claimant's favor, and the conduct of the union and A. O. Smith, the claimant had meritorious justification for his assertion that he need not pay union dues and that he could retain his status as an employee. Accordingly we conclude that claimant's intent was to continue his employment and his

conduct (his failure to pay dues grounded on religious belief) was consistent with the continuation of the employee-employer relation.

This is not to say that claimant's discharge was improper or that his discharge constituted a violation of the federal Civil Rights Act. In the instant case we are concerned only with claimant's eligibility for unemployment compensation, not with the validity of his discharge or his rights under the federal Civil Rights Act. For purposes of determining whether claimant's discharge can be characterized as a "voluntary termination," we conclude that, because claimant had meritorious justification for his failure to pay dues, his conduct was not inconsistent with his continuation of the employee-employer relation.[14] His failure to pay dues cannot be viewed as a "constructive quit"; his termination was not voluntary under the unemployment compensation act.

*By the Court.*—Judgment reversed and cause remanded with directions to remand the record to the Department of Industry, Labor and Human Relations for further proceedings consistent with this opinion.

COFFEY, J. (*dissenting*). I can agree with the majority that forcing the claimant to make a choice between his religion and his job ought not to be countenanced. He was a trusted and responsible employee for the past 27 years. He was a union member for many years before he changed his religious affiliation. No one questions the sincerity of his objections to union membership based on

---

[14] When we say that there was meritorious justification for claimant's conduct so that his conduct can not be considered a voluntary termination we do not mean that the claimant proved a legal right or defense which is guaranteed to prevail at trial. A meritorious justification is a justification which has a reasonable basis in fact or law, a justification which raises a question of fact or law deserving of investigation and determination.

his religious convictions. The claimant has a right to the free exercise of his religion which has been infringed upon, under the facts of this case. But the remedy available to him is not a claim for unemployment compensation against his employer.

The majority holds that the claimant did not voluntarily quit his employment because he had a good excuse —his religious objection to paying union dues. Others might have the same objection for other reasons. Would the majority deny compensation to a member of a religion which did not prohibit the payment of union dues as a tenet of the faith, notwithstanding that his conviction was just as firm and as sincere as the claimant's? I see no difference in principle. In fact, to allow compensation in the first case and to deny it in the other would amount to an establishment of a religion, prohibited by the same provisions of our state and federal constitutions which grant the right of free exercise of our religious beliefs.

The claimant's reason for terminating his employment was personal to him. Therefore, he voluntarily quit when he chose to follow the mandate of his conscience rather than honor the union security clause of the collective bargaining contract, as the union insisted he should.

Perhaps the majority means to hold that the claimant terminated his employment with good cause attributable to his employing unit. But it was the union, not the company, which insisted on enforcing the union security clause. What else could the employer do? The company suggested alternatives and the union would not agree. Does the majority want the company to repudiate a valid collective bargaining agreement by refusing to honor one of its terms? Must the company expose itself to an unfair labor practice charge? Is it required to represent the claimant in a dispute with the union, which is organized to assert his interests as to pay and conditions of employment against the company? Such a course

would hardly be conducive to labor peace in which there is a compelling state interest.

In *Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63 (1977), the United States Supreme Court held that enforcement of a seniority provision did not violate the Federal Civil Rights Act, even though it had the effect of forcing a worker to choose between his job and his religious beliefs which prohibited him from working on Saturdays. The court noted that national labor policy favored collective bargaining agreements. Our state policy is just as strongly in favor of collective bargaining. The claimant objects to collective bargaining on religious grounds. That is his right, but he is not entitled to unemployment compensation when he leaves his employment because he refuses to be a part of a collective bargaining unit.

The majority refuses to recognize the expertise of the commission because the commission did not consider the Federal Civil Rights Act. Understandably so, because the federal act has no application to the payment of unemployment compensation benefits under Wisconsin law. The remedy for a violation of the federal act is a federal action brought in federal court, as the claimant has done. According to the majority, the claimant has recovered judgment in his federal action. The majority apparently wants to grant him a double recovery by allowing unemployment compensation benefits in addition to the federal court judgment. I can discover nothing in the federal act or the cases cited to us which show congressional intent to require the states to enforce this law as part of their unemployment compensation proceedings.

The purpose of unemployment compensation is not to exact a penalty from an employer whose good-faith dealings with a union result in hardship to an employee who can be compensated under federal law. The commission correctly applied the policy of our state law which

was the only relevant policy to be applied. A claimant who has terminated his employment because of his religious convictions should not have a claim for unemployment compensation unless he can show that his employer, for no legitimate reason, forced him to choose between his conscience and his job. In this case the employer was not at fault. I would affirm. I am authorized to state that Chief Justice BEILFUSS and Mr. Justice CONNOR T. HANSEN join in this dissent.