139 Wis.2d 190 (1987)
407 N.W.2d 281
IN the MATTER OF the GUARDIANSHIP OF K.N.K., an Individual Under Limited Incompetency: K.N.K., Appellant,[]
v.
Virginia BUHLER, Respondent.
No. 86-1135.
Court of Appeals of Wisconsin.
Submitted on briefs February 11, 1987.
Decided April 8, 1987.
*195 For the appellant the cause was submitted on the briefs of Jay K. Nixon of Harvey, Goepel, Barta & Nixon of Racine and Emily S. Mueller of Thompson & Coates, Ltd. of Racine, co-counsel.
For the respondent the cause was submitted on the brief of Roy J. Josten of Josten, DuRocher, Murphy & Pierce, S.C. of Racine.
Before Scott, C.J., Brown, P.J., and Nettesheim, J.
NETTESHEIM, J.
K.N.K. appeals an order subjecting her to protective placement under ch. 55, Stats., and directing the involuntary administration of her medication. On appeal, K.N.K. argues that the circuit court erred in concluding that the statutory requirements for protective placement were met in ordering "acute psychiatric treatment" through the forced administration of psychotropic medication and in failing to dismiss the amended petition seeking protective placement. K.N.K. also challenges the circuit court's order on equal protection and due process grounds. Because we conclude that the circuit court properly ordered the protective placement and treatment of K.N.K. and that this order withstands constitutional scrutiny, we affirm.

PROCEDURAL HISTORY AND FACTS
K.N.K. has suffered from chronic schizophrenia since 1967. Since the diagnosis of her condition, K.N.K.'s doctors have continuously prescribed medication with some encouraging results when K.N.K. has taken the medication. However, the record indicates *196 that K.N.K. has a spotty history of complying with her medication prescriptions. The record also indicates that once K.N.K. stops taking her medication, she reverts into a delusional state.
It is undisputed that K.N.K., on several occasions, has been found to be mentally ill and dangerous and has been committed for treatment pursuant to ch. 51, Stats. Moreover, on February 11, 1981, the circuit court found K.N.K. to be a limited incompetent and appointed a guardian over her person and estate pursuant to secs. 880.33 and 880.37, Stats. The guardianships were limited to those matters relating to the treatment of her illness and to the management of her property with respect to "major decisions concerning her property including but not limited to those decisions concerning investments and substantial giftgiving."
The original petition for protective placement was filed in August 1984. However, because of a stipulation between the parties, this petition was dismissed. The parties further stipulated that a live-in companion would move in with K.N.K. and that K.N.K. would regularly take all prescribed medication.
Because K.N.K.'s guardian believed that K.N.K. was not abiding by the terms of the stipulation, she renewed the protective placement petition in February 1986. It is this petition and the ensuing proceedings which serve as the basis for this appeal.
In June 1986, the circuit court determined that K.N.K. continued to be a limited incompetent due to her mental illness, that this illness caused K.N.K. to be "so totally incapable of providing for her own care or custody so as to create a substantial risk to herself of serious harm" and that K.N.K.'s condition was permanent. Based on these findings, the circuit court *197 ordered that K.N.K. be protectively placed in her own home with the help of a live-in companion, pursuant to sec. 55.06, Stats. The court determined this placement to be the least restrictive environment consistent with K.N.K.'s needs. In addition, the circuit court ordered the involuntary administration of K.N.K.'s medication. K.N.K. appeals.

SUFFICIENCY OF EVIDENCE
[1, 2]
Section 55.06, Stats., provides for the protective placement of an individual for the primary purpose of providing care and custody following a determination of incompetency in accordance with ch. 880, Stats. In re Guardianship & Protective Placement of Shaw, 87 Wis. 2d 503, 510, 275 N.W.2d 143, 147 (Ct. App. 1979). Before a mentally ill individual may be protectively placed under sec. 55.06, the circuit court must determine:
1. That the individual to be placed is incompetent;
2. That the individual has a primary need for residential care and custody;
3. That, as a result of mental illness, the individual is so incapable of providing for his or her own care or custody that the condition creates a substantial risk of serious harm to the individual or others;
4. That the individual's disability is permanent or likely to be permanent.
Id. Each of these prerequisites to protective placement must be shown by clear and convincing evidence. See secs. 55.06(7) and 880.33(3), Stats. Moreover, a court operating under this statute can only order the *198 protective placement of an individual in the "least restrictive environment consistent with the [individual's] needs." Sec. 55.06(9).
K.N.K. argues that the evidence does not support the circuit court's conclusion that K.N.K. met the statutory prerequisites for protective placement.
[3]
We view the elements of protective placement set out in sec. 55.06(2), Stats., as questions of fact. See sec. 55.06(7) (trier of fact "must find by clear and convincing evidence" the elements of sec. 55.06(2)); sec. 880.33, Stats. (referring to "findings" of incompetency). We will not overturn the circuit court's findings of fact unless clearly erroneous. Sec. 805.17(2), Stats. However, we view the higher question regarding the necessity for protective placement as one of law because it involves the application of the facts as found by the court to a statutory concept. See Nottelson v. DIHLR, 94 Wis. 2d 106, 115-16, 287 N.W.2d 763, 768 (1980). We review questions of law independently from a circuit court's conclusions. Ball v. District No. 4, Area Bd., 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984).

1. Incompetence
[4]
Section 880.01(4), Stats., provides that a person is "incompetent" if he or she is adjudged by a court to be substantially incapable of managing his or her property or caring for himself or herself by reason of the infirmities of aging, developmental disabilities or other like incapacities. The phrase "other like incapacities" includes "those conditions ... which are the result of ... mental ... disability." Sec. 880.01(8). *199 Incompetency addresses the ability of an individual to make decisions for himself or herself. Shaw, 87 Wis. 2d at 513, 275 N.W.2d at 148.
[5]
K.N.K. argues that because the circuit court only found her to be a "limited incompetent," under sec. 880.33(3), Stats., the incompetency requirement under sec. 55.06(2), Stats., was not met. Consequently, we are faced with a question of statutory interpretation, i.e., whether a sec. 880.33(3) finding of limited incompetency satisfies the sec. 55.06(2) incompetency requirement. The interpretation of a statute presents a question of law and, as a result, we need not give special deference to the circuit court's determination. Tahtinen v. MSI Ins. Co., 122 Wis. 2d 158, 166, 361 N.W.2d 673, 677 (1985).
[6]
We conclude that a circuit court's finding of limited incompetence under ch. 880, Stats., fulfills the incompetency requirement for protective placement under sec. 55.06, Stats. Section 55.06(1) provides that a protective placement may not be ordered "unless there is a determination of incompetency in accordance with ch. 880." Section 880.33(3), Stats., specifically provides for a trial court's "finding of limited incompetency." Consequently, as required by sec. 55.06(1), the circuit court found K.N.K. to be incompetent in accordance with ch. 880.
Our conclusion is in compliance with another decision of this court. In Shaw, a case dealing with the protective placement of an alcoholic, we stated:
Upon a finding of incompetency to make decisions relating to drinking, the court must appoint a guardian of the individual's property *200 and/or person, consistent with the doctrine of least restrictive alternative. Sec. 55.001, Stats. Where the individual, when intoxicated, is incompetent to perform other legally significant acts, and chooses to continue his alcoholic life-style, the court may terminate those specific rights under sec. 880.33(3), Stats. Where the individual is protectively placed or is otherwise prevented from drinking, the court should reinstate those rights which were terminated under sec. 880.33(3) for which he is no longer incompetent. [Citation omitted.]
87 Wis. 2d at 513, 275 N.W.2d at 148-49. This language indicates that an individual may be competent to deal with some portions of his or her life, incompetent to deal with other portions and, if the remaining sec. 55.06(2), Stats., requirements are satisfied, properly ordered into protective placement. This appears to be the nature of K.N.K.'s disability and the circuit court's finding of limited incompetency accommodates this condition.

2. Primary Need
K.N.K. next argues that the evidence fails to show that she has a "primary need" for protective placement as required by sec. 55.06(2)(a), Stats. She asserts that, if anything, the evidence only indicates that her primary need is for active treatment with psychotropic medication under ch. 51, Stats.not ch. 55, Stats. We disagree.
This element comtemplates a finding by the circuit court that the individual's "primary need is for protective placement rather than for active treatment or protective services." Shaw, 87 Wis. 2d at 514, 275 N.W.2d at 149. In Shaw, the court of appeals concluded that to allow the protective placement of an *201 alcoholic whose primary need was treatment severely undercut the requirements and protective features of the ch. 51, Stats., provision for involuntary commitment of alcoholics. Id. The court distinguished between "later stage alcoholics," who have a long history of alcoholic abuse which results in physical debilitation, including probable brain damage, on the one hand, and some "revolving door alcoholics," who do not have a primary need for protective placement, on the other. Id. at 514 & n. 2, 275 N.W.2d at 149. Revolving door alcoholics were described as alcoholics who are repeatedly detoxified and occasionally committed for treatment under ch. 51. Id. at 514, 275 N.W.2d at 149.
At first glance, K.N.K.'s argument has appeal because of the similarity between the "revolving door alcoholic" and K.N.K.'s mental illness history. It is undisputed that K.N.K. has previously been committed under ch. 51, Stats., reintroduced to the medication which controls her delusional state, then released after the expiration of the commitment order, only to have her stop the ingestion of the medication, slip back into a delusional state and start the entire process over. However, this similarity is superficial only and does not withstand scrutiny when the true purposes of chs. 51 and 55, Stats., are considered.
[7]
While the evidence does not indicate that K.N.K.'s mental illness would necessarily result in the type of progressive physical debilitation which is exhibited by the chronic alcoholic, Shaw does not stand for the proposition that this is the only kind of debilitation which will warrant a primary need for protective placement. K.N.K.'s debilitation lies in her mental illness which is rendered permanent because *202 of her continuing inability or refusal to address it or assist in treating it. It is this history which demonstrates, more than any other fact, that K.N.K. requires more than active treatment under ch. 51, Stats., and that K.N.K. has now progressed to the point where her primary need is for protective placement. Under K.N.K.'s argument, she could be perpetually involved in the ch. 51 commitment system and never be subject to a ch. 55, Stats., placement. While this might be true for some chronically mentally ill individuals, the question here is whether the trial court's finding of a primary need for the protective placement of K.N.K. is clearly erroneous. We conclude it is not.

3. Substantial Risk of Serious Harm
Next, K.N.K. argues that the evidence does not sufficiently show the dangerousness element found in sec. 55.06(2)(c), Stats.:
As a result of developmental disabilities, infirmities of aging, chronic mental illness or other like incapacities, [the individual] is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to oneself or others. Serious harm may be occasioned by overt acts or acts of omission[.]
This risk of serious harm must be substantial. Shaw, 87 Wis. 2d at 514-15, 275 N.W.2d at 149. The harm envisioned may not be based on mere speculation but must be directly foreseeable from the overt acts or omissions of the individual. Id. at 515, 275 N.W.2d at 149. *203 [8]
K.N.K. complains that the trial court's finding of this prerequisite was not based upon evidence of any recent acts or omissions. Rather, K.N.K. points out that the only foreseeable harm indicated by the evidence was the "prospect of deterioration without forced medication." (Emphasis deleted.) We disagree and conclude that the trial court's finding that K.N.K.'s overt acts or omissions fulfilled this requirement was sufficiently supported by the evidence.
We first note that the statute does not require that dangerousness be proven by recent acts or omissions. The evidence clearly showed that K.N.K.'s "pattern" was to refrain from ingesting her medication when not forced to do so and slip back into a delusional state. The evidence also indicated that once K.N.K. reverted back to a delusional state, serious harm was directly foreseeable in that her delusions have, in the past, placed her and others in direct risk of serious harm. For example, the evidence indicated that K.N.K. attempted to jump out of a moving automobile, left an automobile running in a closed garage, drove in an erratic fashion and turned the heat off in her home in the middle of winter. We consider K.N.K.'s past history to be a reliable prediction of the foreseeable harm which may result if she were not subjected to protective placement.

4. Permanency
The final criterion that K.N.K. disputes is that she "[h]as a disability which is permanent or likely to be permanent." Sec. 55.06(2)(d), Stats. This requirement can be satisfied by a finding that the individual is not treatable by presently known methods. Shaw, *204 87 Wis. 2d at 515, 275 N.W.2d at 149. For us to affirm the trial court's finding that K.N.K. met this criterion, the evidence must show that K.N.K.'s inability to care for herself due to the effects of her mental illness is permanent or likely to be permanent. Id.
K.N.K. points out that the testimony showed that she would respond to the treatment with medication and improve. Consequently, she argues that her condition cannot be considered permanent as required by sec. 55.06(2)(d), Stats.
[9]
However, what we are faced with here is not whether K.N.K.'s delusional state, considered in a vacuum, is permanent, but rather whether such condition is permanent because of K.N.K.'s ongoing refusal to take her medication which results in her inability to care for herself. Again, the historical evidence makes it abundantly clear that allowing K.N.K. to voluntarily ingest her medication will result in her refusal to comply and, as a consequence, her subsequent mental regression. The trial court's finding that K.N.K.'s disability is permanent or likely to be permanent is not clearly erroneous.
Therefore, we conclude that all elements necessary to support the conclusion of the trial court that K.N.K. should be protectively placed were sufficiently proven.

INVOLUNTARY ADMINISTRATION OF PSYCHOTROPIC DRUGS
K.N.K.'s next argument hinges on the language of the commitment order which permitted the involuntary administration of her medication. She argues that the court has no authority to make such an order. *205 From this language, K.N.K. also finds support for her claim that the proper procedure should have been a ch. 51, Stats., proceeding.
Section 55.07, Stats., provides that the statutory patient's rights detailed in sec. 51.61, Stats., also apply to persons committed under ch. 55, Stats. This list of a patient's rights includes a limited right to refuse medications and medical treatment. See sec. 51.61(1)(h). Moreover, sec. 51.61(1)(g) provides that a court may order the involuntary administration of psychotropic drugs "[a]t or after the hearing to determine probable cause for commitment but prior to the final commitment order." (Emphasis added.)[1] No *206 other authority exists for a circuit court to order medication following a protective placement.[2]
[10]
The question here again is one of statutory construction which we review independently from the trial court's ruling. See Tahtinen, 122 Wis. 2d at 166, 361 N.W.2d at 677. We conclude that the language of the statutes noted above is clear and unambiguous. It does not allow for the type of order entered here. Therefore, we agree with K.N.K. that the trial court had no authority to enter the order for the involuntary administration of her medication.
Rather, an individual protectively placed under ch. 55, Stats., is required to take medication only at the "written order of a physician" unless the individual meets the "religious grounds" exception detailed in *207 the statute. Sec. 51.61(1)(h), Stats. This exception is not an issue in this case.
[11]
However, the presence of this erroneous language in the commitment order does not invalidate K.N.K.'s commitment. This language stands as mere surplusage and is without any legal effect. K.N.K. retains her statutory rights as recited in sec. 51.61, Stats., including her limited right to refuse medication.[3]
K.N.K. further argues that this language of the commitment order signals that her commitment, if warranted at all, should have been under ch. 51, Stats. She relies upon the language of sec. 55.06(9), Stats., which provides in relevant part:
Placement shall be made in the least restrictive environment consistent with the needs of the person to be placed. Factors to be considered in making protective placement shall include the needs of the person to be protected for health, social or rehabilitative services and the level of supervision needed. Placement under this section does not replace commitment of a person in need of acute psychiatric treatment under s. 51.20 or 51.45(13). [Emphasis added.] *208 Again, statutory interpretation is a question of law which we will review independently from the trial court. See Tahtinen, 122 Wis. 2d at 166, 361 N.W.2d at 677. In addition, as to this issue, we are required to apply the facts of this case to the statute. This also presents a question of law. Bucyrus-Erie Co. v. DILHR, 90 Wis. 2d 408, 417, 280 N.W.2d 142, 146-47 (1979).
In determining the meaning of any single phrase in a statute, it is necessary to view the act as a whole. State v. Phillips, 99 Wis. 2d 46, 50, 298 N.W.2d 239, 241 (Ct. App. 1980). Viewed in this light, we conclude the statute is clear and unambiguous. It does not forbid psychiatric treatment to one who is protectively placed. As a matter of fact, ch. 55, Stats., expressly recognizes that the chronically mentally ill might be candidates for protective placement. See sec. 55.001, Stats. (providing that "[t]he legislature recognizes that many citizens of the state, because of the infirmities of ... chronic mental illness ... are in need of protective services."). Rather, what the statute forbids is the protective placement of one who is more properly treated under ch. 51, Stats.
[12]
This returns us, in part, to our earlier discussion as to K.N.K.'s present condition which reveals a "primary need" for protective placement. While it might be said that K.N.K. also presents a need for acute psychiatric treatment under ch. 51, Stats., her primary need, viewed in light of her repeated inability or refusal to address her mental illness, is for protective placementnot for the delivery of acute psychiatric care. The fact that the trial court recognized K.N.K.'s need for psychiatric care does not serve to invalidate her protective placement. A placement under ch. 55, Stats., may, if the need exists, include a *209 course of psychiatric treatment. Otherwise the placement would serve as nothing more than a warehousing of the mentally ill or persons with other incapacities contemplated by ch. 55.

CONSTITUTIONAL CLAIMS
Because the evidence does not show that she committed any recent acts relative to the dangerousness prerequisite of sec. 55.06(2)(c), Stats., K.N.K. argues that her equal protection and due process rights were violated. In support of her position, K.N.K. points to the ch. 51, Stats., requirement that dangerousness be shown by an individual's recent overt acts or omissions. See sec. 51.20(1)(a)2, Stats.

1. Equal Protection
[13]
Classifications made by the Wisconsin legislature carry a strong presumption of constitutionality. State ex rel. Watts v. Combined Community Servs. Bd., 122 Wis. 2d 65, 79, 362 N.W.2d 104, 110 (1985). Equal protection does not require that all persons be dealt with identically but rather requires that a distinction made have some relevance to the purpose for which the classification is made. Id. at 79, 362 N.W.2d at 111. Equal protection of the law is denied only when the legislature makes irrational or arbitrary classifications. Omernik v. State, 64 Wis. 2d 6, 18-19, 218 N.W.2d 734, 742 (1974). It is undisputed that the acts or omissions which are required for commitment under ch. 51, Stats., and those which may be used to justify placement under ch. 55, Stats., are temporally distinct.
*210 [14]
We conclude that this distinction has a rational basis which is related to the underlying distinction between commitment and placement.[4]See id. That is, a mentally ill individual who is validly placed under ch. 55, Stats., has a mental illness which is deemed "permanent or likely to be permanent." Unlike a ch. 51, Stats., commitment, an individual placed under ch. 55 suffers from a disorder which is predicted to be immutable. The basis for this prediction cannot only be limited to the individual's recent acts or omissions, although they may certainly be relevant. Rather, because of the temporal nature of the placement requirements, the commitment may be based on a broader history of the individual's acts or omissions evincing a qualifying disorder. Consequently, we conclude that K.N.K.'s equal protection rights were not violated.

2. Due Process
K.N.K. argues that using ch. 55, Stats., to confine or involuntarily treat a person who is not presently *211 dangerous violates that person's due process guarantees. Her argument is not so much aimed at the actual procedures used for confinement. Rather, she describes her challenge as based "upon substantive rights arising under the due process clause" which are controlling regardless of the procedures employed.
[15]
K.N.K. correctly notes that a state must establish more than mental illness before depriving an individual of his or her liberty or privacy. O'Connor v. Donaldson, 422 U.S. 563, 576 (1975). The state must prove that the individual is mentally ill and dangerous. Lessard v. Schmidt, 349 F. Supp. 1078, 1095 (E.D. Wis. 1972).[5]
Here, while a showing of dangerousness is specifically required under ch. 55, Stats., proof of recent overt acts in support thereof is not. We do not, however, see this as constitutionally fatal to the trial court's application of the statute to K.N.K. The substantive guarantee of due process requires that legislation have a rational relationship to a legitimate end of government. J. Nowak, R. Rotunda & J. Young, Constitutional Law 443 (2d ed. 1983). When certain fundamental rights are affected by governmental action, a strict judicial scrutiny is required. Id. at 460. Included in these fundamental rights are "liberty" interests and the right to privacy. Id. at 454, 460-61. The power of the state to deprive a person of the fundamental liberty to go unimpeded about his or her affairs must rest on a consideration that society has a compelling interest in such deprivation. Lessard, 349 *212 F. Supp. at 1084. In commitment cases, this is satisfied by proof that the individual is mentally ill and dangerous. Id. at 1095.
This does not mean, however, that the definition of dangerousness for purposes of ch. 51, Stats., commitments must be the same as that for purposes of ch. 55, Stats., placements in order for the latter to pass substantive due process muster. As we noted earlier, the element of "permanency" must accompany the disability suffered by one who is sought to be protectively placed. Also, as earlier noted, the distinctions between the two types of placement constitutionally permit, on equal protection grounds, the use of a broader time period in evaluating an individual's alleged dangerousness in protective placement proceedings than in mental commitment proceedings.
[16]
We conclude that this distinction also saves the statute's application on the due process challenge made by K.N.K. A person's potential for doing harm to himself or others is a great enough reason to justify such a massive curtailment of liberty. Lessard, 349 F. Supp. at 1091. In protective placement cases, the potential for doing harm is not necessarily premised upon proof of recent acts, but rather upon the permanency of the conditionan element not required to be proven in a ch. 51, Stats., proceeding. This proof requirement upon the state adequately addresses the individual's fundamental rights to liberty and privacy. Balanced against the state's legitimate interest in protecting the individual and others from the prospect of harm, we conclude that proof of dangerousness in a protective placement case without the necessity of proof of recent acts or omissions is constitutionally permissible. Therefore, we reject K.N.K.'s substantive *213 due process challenge to the application of the statute to her.

ALLEGED DEFECTS IN PETITION
[17]
K.N.K. argues that the petition which serves as the basis for this appeal failed to state allegations which were based on "personal knowledge" as required by sec. 55.06(3)(b), Stats. This statute provides:
The petition ... shall be based on personal knowledge of the individual alleged to need protective placement.
Interpretation of a statute presents a question of law. Tahtinen, 122 Wis. 2d at 166, 361 N.W.2d at 677. At first reading, the statute appears to require that the petition allegations be based on the personal knowledge of the alleged incompetent. However, this leads to the absurd result that the alleged incompetent state personal knowledge as to herself or himself. Consequently, we reject this interpretation of sec. 55.06(3)(b). See Phillips, 99 Wis. 2d at 51, 298 N.W.2d at 242. Rather, we view this statute to require that a third-person-petitioner have knowledge of the individual alleged to need protective placement.
In this light, K.N.K. argues that the allegations in the petition were not based on the personal knowledge of the petitioner-guardian. Rather, she asserts that "[a] close reading of the allegations indicates that they are based upon information and belief, contrary to the requirements of the statute." However, we view the legislature's intention behind the "personal knowledge" requirement as one which would insure that the petitioner's allegations are reliable. The legislature *214 did not intend that a petitioner must be omnipresent; the petitioner need only state the sources of the information alleged in the petition if not based upon the petitioner's personal observations. We deem the petition sufficient in this respect.
[18]
Next, K.N.K. argues that the petition did not adequately state the factual basis for the allegations as required by sec. 55.06(3)(a), Stats.[6] We look to other pleading forms in order to test the sufficiency of a petition. See Schroedel Corp. v. State Highway Comm'n, 34 Wis. 2d 32, 42, 148 N.W.2d 691, 696 (1967) (the words "petitioner" and "plaintiff" are virtually synonymous in legal nomenclature). Like complaints, we liberally construe the petition and will sustain it if the petition gives reasonable notice to the alleged incompetent with respect to the nature of the claim. See Anderson v. Continental Ins. Co., 85 Wis. 2d 675, 684, 271 N.W.2d 368, 373 (1978). Here, the petition and its addenda lay out K.N.K.'s alleged acts or omissions with sufficient particularly to meet the requirement under sec. 55.06(3)(a). We deem the petition sufficient in this respect.
K.N.K.'s final contention relates to the service of the petition.[7] Section 55.06(5), Stats., requires:

*215 Notice of a petition for placement shall be served upon the person sought to be placed by personal service at least 10 days prior to the time set for a hearing. Upon service of the notice the person sought to be protected shall be informed of the complete contents of the notice. The person serving the notice shall return a certificate to the circuit judge verifying that the petition has been delivered and notice given.
Here, it is undisputed that a process server was within the confines of K.N.K.'s home and attempted to personally deliver the documents to her. K.N.K. would not, however, emerge from her bedroom to accept the documents, despite the fact that the process server was repeatedly banging on the bedroom door. Reluctant to forceably enter K.N.K.'s bedroom to inform her of the contents of the petition, the server left the papers outside the bedroom door and departed. This constituted personal service under the law. See Borden v. Borden, 63 Wis. 374, 377, 23 N.W. 573, 574 (1885).
K.N.K.'s specific complaint is that she was improperly served because the process server did not read the "contents of the pleadings" to her. We first note that the statute does not require a reading of the petition but rather that the person sought to be served "be informed of the complete contents of the notice." Never has K.N.K. complained about lack of notice that a further protective placement proceeding had been commenced against her or that she did not have notice of all the proceedings.
[19]
Even if this were the case, we would hold that the service of the petition and notice was sufficient. When full compliance with the requirement of service of process is thwarted, not by the negligence of the *216 petitioner, but by the obstinance of the person sought to be served, reasonable compliance with the statutory requirements will suffice. Such compliance was accomplished in this case. Any other reading would result in absurdity with the process server required to force himself onto the alleged incompetent in order to communicate notice of the petition. We doubt that the legislature intended a method of service which would likely result in property damage and carry the potential for physical harm to all concerned. Acts of violence to accomplish the service of process are not to be tolerated in the law. Id.[8]
By the Court.Order affirmed.
NOTES
[] Petition to review denied.
[1] Section 51.61(1)(g) and (h), Stats., provides in relevant part:

(g) Prior to the final commitment hearing and court commitment orders, [each patient shall] have the right to refuse all medication and treatment except as ordered by the court under this paragraph, or in a situation where such medication or treatment is necessary to prevent serious physical harm to the patient or to others. Medications and treatment during such period may be refused on religious grounds only as provided in par. (h). At or after the hearing to determine probable cause for commitment but prior to the final commitment order, the court may issue an order permitting medication to be administered to the individual regardless of his or her consent if it finds that such medication will have therapeutic value and will not unreasonably impair the ability of the individual to prepare for or participate in subsequent legal proceedings, and that there is probable cause to believe that the individual is not competent to refuse medication. Before issuing such an order, the court shall hold a hearing on the matter which meets the requirements of s. 51.20(5), except for the right to a jury trial. An individual is not competent to refuse medication if because of mental illness, developmental disability, alcoholism or drug dependence, the individual is incapable of expressing an understanding of the advantages and disadvantages of accepting treatment, and the alternatives to accepting the particular treatment offered, after the advantages, disadvantages and alternatives have been explained to the individual. Following a final commitment order, the subject individual does not have the right to refuse medication and treatment except as provided by this section.
(h) [Each patient shall] [h]ave a right to be free from unnecessary or excessive medication at any time. No medication may be administered to a patient except at the written order of a physician. The attending physician is responsible for all medication which is administered to a patient. ... Except when medication or medical treatment has been ordered by the court under par. (g) or is necessary to prevent serious physical harm to others as evidenced by a recent overt act, attempt or threat to do such harm, a patient may refuse medications and medical treatment if the patient is a member of a recognized religious organization and the religious tenets of such organization prohibit such medication and treatment.
[2] An out-patient commitment order under sec. 51.20(13)(dm), Stats., does permit a court to order an individual to take medication but does not permit it to be administered on an involuntary basis. The consequences of a violation of such an order is that the individual may be taken into custody and the medication administered, voluntarily or involuntarily. This section does not apply to protective placement commitments.
[3] K.N.K. argues that forced use of psychotropic drugs rises to the level of acute psychiatric treatment because of their mindaltering effects. See In re Guardianship of Roe, 421 N.E.2d 40, 52-53 (Mass. 1981). We do not dispute K.N.K.'s contention. We also note that because of the mind-altering effects and recognized side effects of psychotropic drugs, the informed consent provisions of sec. 51.61(1)(k), Stats., may become an issue in future cases. See id. at 53-54; State ex rel. Jones v. Gerhardstein, 135 Wis. 2d 161, 175 & n. 3, 400 N.W.2d 1, 6 (Ct. App. 1986). This issue, however, was not raised in this litigation.
[4] In State ex rel. Watts v. Combined Community Servs. Bd., 122 Wis. 2d 65, 81 n. 8, 362 N.W.2d 104, 112 (1985), the Wisconsin Supreme Court discussed the level of constitutional scrutiny which courts should apply when reviewing classifications among classes of mentally ill. The court did not, however, decide which level of scrutiny should be applied in such cases. Using the Watts rationale, we also do not establish a specific level of scrutiny but, rather, conclude that the classification in this case survives even the highest level. Because of the permanency theme underlying ch. 55, Stats., the state has a compelling interest in requiring that all the historical acts of the alleged incompetent be viewed when determining whether or not the dangerousness requirement has been met.
[5] Vacated on procedural grounds, 414 U.S. 473 (1974); on remand, 379 F. Supp. 1376 (E.D. Wis. 1974); vacated, 421 U.S. 957 (1975); on remand, 413 F. Supp. 1318 (E.D. Wis. 1976).
[6] K.N.K. also argues that this petition is insufficient because it failed to detail recent acts or omissions indicating that she was in substantial risk of serious harm to herself or others. Because of our earlier conclusions, we do not address this issue.
[7] The trial court indicated that K.N.K. may have waived her right to dispute the service of the petition because of her general appearance which occurred prior to the raising of this objection. The record does not indicate, however, that such a general appearance occurred.
[8] Our conclusion that the process server did not, under the facts of this case, have to advise K.N.K. of the contents of the notice disposes of K.N.K.'s further claim that the certificate of service was defective for failure to state this event.