BARRON ELECTRIC COOPERATIVE, Petitioner-Respondent,†

v.

PUBLIC SERVICE COMMISSION OF WISCONSIN, Respondent-Co-Appellant,

NORTHERN STATES POWER COMPANY OF WISCONSIN, Respondent-Co-Appellant.

Court of Appeals

*No. 97–0420. Submitted on briefs July 9, 1997.—Decided August 7, 1997.*

(Also reported in 569 N.W.2d 726.)

†Petition to review denied.

752

On behalf of the respondent-co-appellant *Public Service Commission of Wisconsin*, the cause was submitted on the briefs of *Steven Levine* of *Public Service Commission of Wisconsin*.

On behalf of the respondent-co-appellant *Northern States Power Company of Wisconsin,* the cause was submitted on the briefs of *Lisa S. Keyes* of *Michael, Best & Friedrich* of Madison.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Charles S. Van Sickle* of *Wheeler, Van Sickle & Anderson, S.C.,* of Madison.

Before Eich, C.J., Vergeront and Deininger, JJ.

EICH, C.J. The Public Service Commission and Northern States Power Company of Wisconsin (NSP) appeal from an order reversing the commission's decision that Barron Electric Cooperative does not have the right to provide electric service in a residential development in rural Barron County. The commission ruled that Barron's extension of service to a duplex residence in the development violated § 196.495(1m)(b), STATS., and ordered removal of the offending line. Section 196.495 defines two classes of electric utility service extensions according to length. An extension of 500 feet of line or more is a "primary voltage extension"; an extension of less than 500 feet is a "secondary voltage extension." The statute generally prohibits electric utilities from constructing a primary extension to unserved premises to which service is available from another utility through a secondary extension. Under § 196.495(1)(b), the length of an extension is to be measured by "the air line distance between an existing local service distribution line . . . and the nearest point on the principal building or facility to be served by . . . [the] extension."[1]

---

[1] The statute reads as follows:

**196.495 Avoidance of duplication in electric facilities. (1)**
(a) In this section:

The commission's conclusion that Barron's line to the duplex violated § 196.495, STATS., was based on its determination that the line was a primary extension within the meaning of the statute, while NSP had the ability to serve the duplex through a secondary extension. The circuit court disagreed. Employing a *de novo* standard of review, the court concluded that neither utility could serve the property via a secondary extension and, as a result, there could be no violation of the statute.

The crucial issue is the scope of judicial review of the commission's decision interpreting and applying the provisions of § 196.495, STATS., to the found facts. In this case, as in many other administrative appeals, the ultimate decision is largely driven by the degree of deference we owe, or do not owe, to the agency's decision.

1. "Primary voltage extension" means an extension of 500 feet or more.

2. "Secondary voltage extension" means an extension that is less than 500 feet.

(b) The length of an extension shall be measured as the air line distance between an existing local service distribution line . . . and the nearest point on the principal building or facility to be served by . . . [the] extension . . . .

. . . .

(1m) No public utility, and no cooperative association . . . may:

. . . .

(b) Make a primary voltage extension to serve the premises of any person not receiving electric service and to which service is available from the facilities of another public utility or . . . cooperative . . . through a secondary voltage extension, unless the other . . . utility or cooperative . . . consents . . . in writing or unless the commission . . . determines that the service rendered or to be rendered by the other . . . utility or cooperative . . . is inadequate . . . or that the rates charged for service are unreasonable . . . .

As indicated, the circuit court concluded that it owed little or no deference to the commission's decision and, arriving at its own differing interpretation of the applicable statute, reversed the order. In our view, the commission's decision is entitled to great weight and should be affirmed if it is reasonable, even if another interpretation—such as Barron's or the trial court's—may be equally reasonable. Because we are satisfied that the commission's decision meets the test of reasonableness, we affirm it and reverse the order of the circuit court.

The facts are not in dispute. Charles and Phyllis Cook have owned a farm near the Village of Cameron since 1963, receiving electric service from Barron. In 1976, the Cooks sold off the farm buildings. Gradually, they split up the remaining property and acquired other parcels. While some land remains in use for farming, other portions of the property have been developed for residential use. The area in question is sometimes called Cooksville and referred to by the Cooks as a subdivision—although it has never been formally platted as one. It is an oblong piece of property containing more than forty-five residential lots stretching in a north-south direction from 15th Avenue on the north to County Highway W on the south. The residential lots are separated from the original farm buildings by U.S. Highway 53 on the west. To the east, a cranberry bog runs along the lots.

Both Barron and NSP had pre-existing electric lines in the area. Barron's runs east-west along 15th Avenue on the northern edge of the subdivision, and NSP's tracks Highway W on the south, also in an east-west direction. In July 1994, the Cooks signed a service agreement with Barron to extend its line southward from 15th Avenue to a parcel known as Lot 15, which

was located just into the southern half of the subdivision—some 1600 feet from Barron's 15th Avenue line. The service agreement described Lot 15 as an "unimproved lot." According to the commission's findings of fact, Mr. Cook was storing a camper and some excavating equipment on the property at the time the line was extended to the lot on September 9, 1994. At some unspecified later time, he placed a second camper on the lot. Two weeks after Barron's initial extension to Lot 15, it extended the line farther south to a security light after the Cooks began experiencing problems with trespassers and vandalism in the area.

On September 15, 1994, Dennis Zinsmaster signed an agreement for Barron to extend service to a duplex he planned to construct at the very southern edge of the subdivision—only some 300 feet north of Highway W, where the NSP line was located. Learning of the extension, NSP complained to the commission that Barron had violated § 196.495, STATS., by extending its 15th Avenue line some 5500 feet to the Zinsmaster duplex, which NSP claimed was the "principal building or facility to be served by . . . [the] extension" within the meaning of § 196.495(1)(b), and which was only 300 feet from NSP's existing line along Highway W. Barron took the position that the "principal building or facility" being served, at least at the outset, was Lot 15 and, eventually, the security light erected somewhere between Lot 15 and the Zinsmaster parcel. Both points were more than 500 feet from either Barron's or NSP's then-existing lines.

The commission agreed with NSP, holding first that the extension closer to the Zinsmaster parcel, the security light, was not the proper point to begin the 500-foot measurement to the duplex because it was not a "principal building or facility" within the meaning of

the statute.[2] The commission then considered whether Lot 15 could be considered such a facility and ruled that it could not, reasoning as follows:

> The purpose of Cooksville is to offer permanent residences to the public. For this reason, the temporary campers at Lot 15 cannot be considered principal buildings or facilities. [The Zinsmaster] [d]uplex . . . must therefore be the principal building or facility served by the B[arron] extension. B[arron]'s line is a primary voltage extension, 5,581 feet long. NSP can serve [the] [d]uplex . . . with a secondary voltage extension, approximately 300 [feet] long. According to the 500-foot rule set forth in s. 196.495 (1) and (1m)(b), Stats., NSP is the proper service provider to [the] [d]uplex . . . .

Barron sought judicial review of the commission's decision and its order requiring it to remove the service line. As indicated, the circuit court reversed, concluding first that the commission's decision was entitled to no deference because it was based on the "purpose" of the development rather than on the agency's expertise and past experience. Then, determining that the camper on Lot 15 was a proper starting point for the necessary measurements, the court concluded that because both utilities' existing lines were more than 500 feet from Lot 15, the

---

[2] In so ruling, the commission relied on a prior case in which it had ruled that similar light fixtures did not constitute "principal building[s] or facilit[ies]" within the meaning of § 196.495(1)(b), Stats. *See Polk-Burnett Elec. Coop.,* PSCW Docket 4220-DR–106 (June 29, 1995), at 7. The commission also relied on the subsequent codification of *Polk-Burnett.* Although the decision as well as the codification occurred *after* the events in this case, the commission reasoned that the same analysis applied.

restrictions in § 196.495, STATS., were inapplicable and the Cooks could contract for service for the Zinsmaster lot from either provider.

## I. Standard of Review

Not surprisingly, the parties differ as to the appropriate standard governing our review of the commission's order.[3] The commission and NSP argue for deferential review, while Barron urges us to consider the commission's decision *de novo*, as the trial court did.

While we begin with the proposition that the interpretation of statutes, and their application to found facts, is a question of law for the courts, not for administrative agencies, an equally important principle of administrative law is that, in recognition of the expertise and experience possessed by agencies, courts will defer to their interpretation of statutes in certain situations. When, and to what degree, deference should be paid to an agency's decision in a given case has been the subject of much discussion in the supreme court and this court over the years. This discussion has culminated in *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 539 N.W.2d 98 (1995), where the supreme court, summarizing several prior cases, outlined three possible levels of deference courts should apply to an administrative agency's legal conclusions and statutory interpretations.

■

According to *Harnischfeger,* courts should grant the highest level of deference—"great deference"—to

---

[3] In appeals from circuit court decisions in administrative review cases, we review the decision of the agency, not the court. *Sterlingworth Condominium Ass'n v. DNR,* 205 Wis. 2d 702, 712, 556 N.W.2d 791, 794 (Ct. App. 1996).

the agency where: (1) it is charged with administration of the statute being interpreted; (2) its interpretation "is one of long-standing"; (3) it employed "its expertise or specialized knowledge" in arriving at its interpretation; and (4) its interpretation "will provide uniformity and consistency in the application of the statute." *Id.* at 660, 539 N.W.2d at 102. Where great deference is appropriate, the agency's interpretation will be sustained if it is reasonable—even if an alternative reading of the statute is more reasonable. *Id.* at 661, 663, 539 N.W.2d at 102, 103.[4] We also will pay great deference to an agency's interpretation "if it is intertwined with value and policy determinations" inherent in the agency's statutory decisionmaking function. *Sterlingworth Condominium Ass'n v. DNR,* 205 Wis. 2d 702, 724, 556 N.W.2d 791, 798–99 (Ct. App. 1996).[5]

---

[4] The burden of proof to show that the agency's interpretation is unreasonable is on the party seeking to overturn the agency's action; the agency does not have to justify its interpretation. *Harnischfeger Corp. v. LIRC,* 196 Wis. 2d 650, 661, 539 N.W.2d 98, 102 (1995).

[5] While we said in *Sterlingworth* that we pay "special deference" to the agency's decisions involving matters of "value and policy," the context of our discussion suggests that we were indeed considering the great deference standard where, as indicated above, we will sustain an agency's reasonable interpretation even if another, equally reasonable, interpretation may be posed. We said, for example:

> When an agency has particular competence or expertise on an issue, we will sustain its legal conclusions if they are reasonable. We *also* accord special deference to the agency's decision if it is intertwined with value and policy determinations.

*Sterlingworth,* 205 Wis. 2d at 723–24, 556 N.W.2d at 798–99 (citations omitted) (emphasis added).

■ The second level of deference discussed in *Harnischfeger*—"due-weight" deference—differs from great deference only in slight degree. According to the supreme court, it is appropriate "when the agency has some experience in an area, but has not developed the expertise which necessarily places it in a better position to make judgments regarding the interpretation of the statute than a court." *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 286, 548 N.W.2d 57, 62 (1996).[6] The deference accorded the agency in this situation "is not so much based upon its knowledge or skill as it is on the fact that the legislature has charged the agency with the enforcement of the statute in question." *Id.* Giving an agency decision due weight, we will also

---

We also note that the line of cases we relied on in *Sterlingworth*—notably *Nelson Bros. Furniture Corp. v. DOR,* 152 Wis. 2d 746, 753, 449 N.W.2d 328, 330–31 (Ct. App. 1989), and *DOT v. Office of the Commissioner of Transportation*, 135 Wis. 2d 195, 199, 400 N.W.2d 15, 16 (Ct. App. 1986)—lead back to the supreme court's decision in *Nottelson v. DILHR,* 94 Wis. 2d 106, 287 N.W.2d 763 (1980). The *Nottelson* court said that "when the expertise of the . . . agency is significant to the value judgment (to the determination of a legal question), the agency's decision, although not controlling, should be given weight." The court explained in a footnote that, when the agency's determination based on such considerations is reasonable, it will be accepted by the courts "irrespective of whether there may have been some other reasonable interpretation or application" of the statute. *Id.* at 117 n.10, 287 N.W.2d at 768.

[6] In *UFE*, the court believed due-weight deference was appropriate because, while the agency had "some experience" in interpreting and applying the particular statute, it had not yet "developed the expertise and specialized knowledge necessary to be accorded great weight deference." *UFE Inc. v. LIRC*, 201 Wis. 2d 274, 288, 548 N.W.2d 57, 63 (1996).

sustain the agency's interpretation if it is reasonable—even if another interpretation is equally reasonable. We will not do so, however, if another interpretation is *more* reasonable than the one employed by the agency. *Id*. at 287, 548 N.W.2d at 62–63.[7]

At the low end of the scale are cases in which courts owe no deference whatever to the agency's legal conclusions or statutory interpretations—cases where we consider the issues *de novo*. We employ a *de novo* review only "when the issue before the agency is clearly one of first impression, or when [the] agency's position on [the] issue has been so inconsistent as to provide no real guidance." *UFE*, 201 Wis. 2d at 285, 548 N.W.2d at 62 (citations omitted). In such a situation, "the weight to be afforded [the agency's] interpretation is no weight at all." *Local No. 695 v. LIRC*, 154 Wis. 2d 75, 84, 452 N.W.2d 368, 372 (1990).

Barron neither challenges the commission's experience or expertise in administering or applying the various provisions of § 196.495, STATS., nor argues

---

[7] The supreme court also said in *UFE* that—under *either* the great deference or due-weight standard—the agency should not be reversed if an alternative interpretation is "equally reasonable." The court explained:

> Under either due weight or great weight deference, an equally reasonable interpretation of a statute should not be chosen over the agency's interpretation. . . . [T]he important difference between great weight and due weight deference [is that] a more reasonable interpretation overcomes an agency's interpretation under due weight deference, while under great weight deference, a more reasonable interpretation will not overcome an agency's interpretation, as long as the agency's interpretation falls within a range of reasonableness.

*Id*. at 287 n.3, 548 N.W.2d at 63.

that the commission's decision in this case will retard or prove detrimental to "uniformity and consistency in the application of the statute." In short, Barron does not dispute the existence of the first, third and fourth *Harnischfeger* factors for determining whether an administrative decision is entitled to great-weight deference. Barron's argument concentrates on the second factor. It argues that because the commission has not pointed to specific past cases in which it has applied the statute to facts that are wholly analogous, or nearly so, to the particular facts of this case, it must be considered a "case of first impression" within the meaning of *UFE* and *Local 695*, entitling the commission's decision to no weight at all.

The test is not, however, whether the commission has ruled on the precise—or even substantially similar—facts in prior cases. If it were, given the myriad factual situations to which the provisions of chapter 196, STATS., may apply, deference would indeed be a rarity. Rather, the cases tell us that the key in determining what, if any, deference courts are to pay to an administrative agency's interpretation of a statute is the agency's experience in administering the particular statutory scheme—and that experience must necessarily derive from consideration of a variety of factual situations and circumstances. Indeed, we have recognized in a series of cases that an agency's experience and expertise need not have been exercised on the precise—or even substantially similar—facts in order for its decisions to be entitled to judicial deference.[8]

---

[8] In *Susie Q Fish Co. v. DOR*, 148 Wis. 2d 862, 868, 436 N.W.2d 914, 917 (Ct. App. 1989), for example, we applied great deference to a decision of the Tax Appeals Commission because of its "general experience in interpreting [applicable tax]

In the case at hand, the Public Service Commission has been charged with administration and enforcement of the antiduplication provisions of § 196.495, STATS., since the statute's adoption in 1955. Indeed, as NSP points out, even prior to adoption of § 196.495, the commission was administering and enforcing similar administrative rules dealing with

statutes," even though it had never ruled "on the specific question involved in this case." We reached a similar conclusion in *Lifedata Medical Services v. LIRC,* 192 Wis. 2d 663, 531 N.W.2d 451 (Ct. App. 1995), where we were asked to review a determination of the Labor and Industry Review Commission that certain persons working for Lifedata were "employees" within the meaning of the unemployment compensation law. The argument was made that we owed no deference to the commission's decision because it had never applied the statutory definition of "employee" in "factual circumstances analogous to the situation here." *Id.* at 671 n.3, 531 N.W.2d at 454. We disagreed and applied the great deference standard based on the commission's "general expertise" in unemployment compensation matters and its experience in determining whether workers in a variety of situations were "employees" within the meaning of the law. *Id.* at 671–72, 531 N.W.2d at 454–55. In a more recent case, *Bretl v. LIRC,* 204 Wis. 2d 93, 105, 553 N.W.2d 550, 554 (Ct. App. 1996), we reviewed the commission's decision that a police officer was entitled to compensation for job-related emotional injuries. Here, too, it was argued that the decision was entitled to no deference "because there is no reported case of a police officer seeking . . . compensation for [post-traumatic stress disorder] from a shooting incident." *Id.* at 105, 553 N.W.2d at 554. We rejected the argument and applied the great deference standard, noting that the commission had been charged with administration of the workers compensation laws for many years, and had applied its general expertise in this area in a variety of traumatic-injury cases.

duplication of electric utility service. The parties have cited us to several cases over the years in which the commission has interpreted and applied the provisions of the statute to public utility territorial disputes, including at least one case involving the very language at issue here. The commission has, in short, a long-standing history of interpreting the statute, and the fact that it may have not considered the precise—or substantially similar—facts in a prior case does not lessen or eliminate the deference that should be accorded to its decisions. We are satisfied that its decision in this case is entitled to great deference and must be affirmed if it is reasonable.

## II. Reasonableness of the Commission's Decision

In *Harnischfeger,* the supreme court framed the "reasonableness" test in the negative: "An interpretation is *un*reasonable if it directly contravenes the words of the statute, it is clearly contrary to legislative intent or it is without [a] rational basis." *Harnischfeger*, 196 Wis. 2d at 662, 539 N.W.2d at 103 (emphasis added). A few years earlier, it used a "positive" definition:

> An agency's interpretation of a statute is reasonable if it accords with the language of the statute, the statute's legislative history, and the legislative intent; if the interpretation is consistent with the constitution, the statute read as a whole, and the purpose of the statute; and if the interpretation is consistent with judicial analyses of the statute.

*Lisney v. LIRC*, 171 Wis. 2d 499, 507, 493 N.W.2d 14, 16 (1992).

As noted above, the commission concluded that the Lot 15 camper site was not a "principal building or facility" because (1) "[t]he purpose of [the subdivision] is to offer permanent residences to the public"; and (2) the campers were "not permanent installations" but only "temporary."

Barron does not challenge the factual predicate of the commission's ruling. It argues that the decision is unreasonable because: (1) the commission "ignored" crucial facts; (2) the decision is "contrary to the protection and benefit of the consuming public"; (3) the outcome is inconsistent with the commission's decision in a prior case; and (4) the entire subdivision should be considered "premises . . . already receiving electric service" from Barron within the meaning of § 196.495(1m)(a), STATS., thus prohibiting NSP from extending service to the Zinsmaster duplex—or any other area within the subdivision.[9] Finally, Barron contends that the commission lacks authority to order removal of its line.

Barron asserts that the following crucial facts—which it believes the commission never considered—compel the conclusion that the campers on Lot 15 constitute "premises" within the meaning of the statute: (1) NSP required the Cooks to pay part of the installation costs to the lots in advance and Barron did not; (2) the Zinsmaster duplex was not in existence when Barron agreed to provide service to Lot 15 and

---

[9] In addition to the provisions of § 196.495(1m)(b), STATS., prohibiting primary extensions to unserved customers who could be served by a secondary extension from another utility, § 196.495(1m)(a) bars a utility from extending or rendering service "to the premises of any person already receiving electric service . . . from another public utility or . . . cooperative association."

that service was connected before NSP began serving the duplex; and (3) the campers were more than 500 feet from the existing NSP line. Stressing the testimony of its general manager that Barron is committed to serving "recreational type facilities, such as cottages, cabins, [and] trailers," Barron argues that the trial court was correct in concluding that the camper site represented the "principal building or facility to be served" within the meaning of § 196.495(1)(b), STATS., and thus the proper point to begin the 500-foot measurements.

In its reply brief, the commission concedes the reasonableness of the trial court's interpretation of § 196.495, STATS., and acknowledges that it is supported by the record. We agree. We also agree with the commission, however, that its decision—that the destination of Barron's primary extension, and the principal facility to be served, was not the campers but the Zinsmaster duplex—is equally reasonable.

The commission rejected the Lot 15 camper site as a "principal building or facility" because the campers, while they may be considered residential structures in some circumstances, were not so in this instance; they were only "temporary," while the duplex was a permanent residence—as are all other homes to be constructed in the proposed subdivision.[10] The commission points out that, while a second camper was eventually moved there, Lot 15 contained only a single uninhabited camper and some excavating equipment when Barron first extended its service line to the lot.

_____

[10] Indeed, according to the director of operations at Barron, Charles Sandmann, when it constructed the extension to Lot 15, it required a "refundable payment" for construction of the extension to Lot 15 "for the reason that the trailers to which service was being extended were not permanent installations."

Additionally, the record does not support the suggestion in Barron's brief that Mr. Cook's brother "lived" in a second camper on Lot 15 at the time service was extended to the lot. The only reference to Mr. Cook's brother living in the camper was that he was doing so at the time of the PSC hearing in October 1995, more than a year after service was connected to the lot. There is no evidence that, at the time of the 1994 service extension, the lot was being used for any purpose other than the storage of the Cooks' own camper and some excavating equipment.[11] Nor is there any question that the property was being developed as a subdivision of permanent residences, and that Barron built the line to serve a residential development, not a trailer park or camper site.[12]

Because the commission's decision represents a reasonable interpretation and application of the antiduplication statutes to the facts of the case, the authorities cited above require that it be affirmed.[13]

---

[11] Mr. Cook affirmatively answered the following question with respect to the second camper: "State whether or not there are *now* two campers on the lot." While he later testified that his brother was living in one of the campers at the time of the October 1995 hearing, he never stated when this arrangement began. The absence of any ongoing "residency" at the lot is also substantiated by the fact that use of electricity at the site was minimal, with no use in the late winter and spring of 1995.

[12] Sandmann testified that Mr. Cook requested the extension "to supply service to his entire . . . plat."

[13] We note in passing that, even if the middle-level due-deference standard were applicable, the result would be the same. Under that standard, courts will not overturn a reasonable agency interpretation "unless . . . a *more reasonable* interpretation [is] available." *UFE Inc.*, 201 Wis. 2d at 287, 548 N.W.2d at 63 (emphasis added). While the circuit court's interpretation is reasonable—and may be said to be as

Barron disagrees, arguing that the commission's decision must be struck down as unreasonable because it is inconsistent with one of its rulings in an earlier case. According to Barron, the commission's failure to follow the earlier ruling is "contrary to the intent and purpose of the concept of avoidance of duplication of facilities . . . contrary to the public interest, and deprives [Barron] of equal protection of the law."

The earlier case upon which Barron relies, *Vernon Electric Cooperative*, PSCW Docket 6080-DR–100 (Oct. 6, 1994), involved a service extension constructed by the Village of Cashton Municipal Electric Utility. The village extended an existing line some 1300 feet to serve a grain elevator in an industrial park it was developing and then, a month or so later, continued the line to provide service to a wastewater lift station it was planning to build within the park. Barron characterizes the commission's ruling in the case as follows:

> The PSC ruled that serving the [elevator] through a line extension that was planned to ultimately serve the lift station . . ., while a violation of the statute, was only a technical violation. The PSC declined to order [the village] to remove its line. It said that such an order would be meaningless for the reason that, under the law, Cashton could immediately rebuild the line and connect service from the new line.

We do not see the *Vernon Electric* case as apropos. As the commission's order in the case recites, a utility or cooperative is specifically authorized by § 196.495(3), STATS., to extend service to its own

---

reasonable as the commission's—we cannot say that it is *more* reasonable.

property, which is precisely what the village did in that case. The commission's declination to engage in the futile act of ordering removal of Cashton's line in light of the village's statutory authority to rebuild it is understandable. Section 196.495(3) is not applicable in this case, however, and we agree with the commission that *Vernon Electric* is readily distinguishable on that basis.

Under § 227.57(8), STATS., we will reverse an agency decision that is inconsistent with a "prior agency practice" when the inconsistency is not explained to our satisfaction. However, a single decision that is factually distinguishable does not violate the rule. *See City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 141 Wis. 2d 10, 16–17, 414 N.W.2d 308, 310 (Ct. App. 1987); *Eau Claire County v. DNR*, 119 Wis. 2d 62, 64, 349 N.W.2d 723, 725 (1984). We see no inconsistency, and no unexplained departure from past agency practice, in the commission's decision.[14]

---

[14] Barron's "equal protection" and "public interest" arguments are not developed beyond its complaint that the commission failed to follow its prior ruling. In another section of its brief, however, Barron contends that the commission's decision "is contrary to the protection and benefit of the consuming public" because the Cooks would have been able to obtain service from Barron without having to make advance payments of a portion of the installation costs, as is required under NSP's tariffs. Barron also asks—without elaboration—how requiring it to remove its lines can be said to benefit either the "consuming public" or the environment.

First, as we have often said, we do not consider unexplained and undeveloped arguments. *M.C.I., Inc. v. Elbin*, 146 Wis. 2d 239, 244–45, 430 N.W.2d 366, 369 (Ct. App. 1988). Second, as the commission argues, the applicable statutes do not include the cost or price of electric service as a factor to be considered in

Barron's next argument is based on § 196.495(1m)(a), STATS., which states that no electric utility may "[e]xtend . . . service . . . to the premises of any person already receiving electric service . . . from another public utility . . . or another cooperative association." According to Barron, the entire subdivision—not just the Zinsmaster duplex—should be considered the appropriate "premises" under this statute. Since Barron had already extended its line to the camper and the security light on Lot 15, it was already serving the "premises" of the subdivision and NSP could not lawfully extend service to the duplex or any other property within the subdivision's boundaries. We agree with the commission that such an interpretation would do violence to the antiduplication provisions of § 196.495(1m)(b).

As Barron acknowledges, the supreme court has recognized that, among the factors to be considered in interpreting and applying the provisions of § 196.495, STATS., are not only the "[p]ropinquity and economy of

---

determining whether there has been a violation of the antiduplication provisions of § 196.495, STATS., or, if a violation exists, in framing the appropriate remedy. We also note that NSP's tariffs are regulated by the commission, while Barron, as a cooperative, does not operate under Public Service Commission regulation. Thus, as NSP points out, Barron "can offer any deal it desires" to prospective customers. Third, with respect to removal of the line—as we discuss below—the legislature has specifically provided for removal of lines installed in violation of § 196.495. Whether such removal may, in an individual case, impose a cost to the utility, and perhaps involve some temporary environmental disruption, the legislature has seen fit to provide removal as the only remedy. Even so, as we note below, the commission's order provides alternatives for compliance which are designed to reduce financial cost and environmental disruption.

service" but also "the overriding purpose of the public utility laws generally: protection of and benefit to the consuming public, and a primary purpose of sec. 196.495, Stats., in particular, the avoidance of duplication of existing service." *Adams-Marquette Elec. Coop. v. Public Serv. Comm'n,* 51 Wis. 2d 718, 742, 188 N.W.2d 515, 527 (1971).

Barron casts the question of "propinquity" as irrelevant, stating that there is "scant difference" between the length of the line either it or NSP would need to serve the entire subdivision. It claims, however, that the $1000 per lot advance deposit requirement of the NSP tariff represents a "huge difference" in the "economy of service," because Barron would not require a similar payment. However, as the commission points out, § 196.495, STATS., does not include the price of electricity to the consumer as a factor to be considered in determining compliance with the antiduplication law. The legislature's primary concern in adopting the statute was, as the supreme court noted in *Adams-Marquette,* avoidance of duplication of facilities and service.

Again, Barron disagrees. It maintains that, contrary to the antiduplication underpinnings of § 196.495, STATS., the commission's order will encourage duplication of service. It asserts that its line, running through the entire subdivision, will allow connection of new homes as they are built, "in an orderly and efficient manner and without duplication of facilities." According to Barron, the subdivision will develop in a haphazard manner, with buyers selecting lots at random for personal and unpredictable reasons. And, because the need for electric service will, as a result, come "at various unscheduled times and from scattered locations," NSP will have to install new

distribution lines as these scattered requests are received, leading to disruption of "streets, driveways, sidewalks, lawns, and other utility services." Again, Barron fails to substantiate the factual assertions on which its argument is based by citing us to the record, nor does it explain how piecemeal service extensions to lots under development will result in duplication of service contrary to § 196.495.

As we have noted above, the plain purpose of the statute is to avoid duplication of service by mandating that the utility whose existing lines are closest to the customer to be served should be the one to serve the property. We agree with the commission that, under Barron's "entire subdivision" argument, a utility located within 500 feet of the corner of a large subdivision would be entitled to serve residences located thousands of feet away—and within only a few yards of another provider's lines—as long as those distant residences were within the boundaries of the same subdivision. We are satisfied that the commission's order conforms to both the letter and spirit of § 196.495, STATS., and we reject Barron's argument that the entire subdivision should be considered "premises . . . already receiving electric service" so as to bar NSP from serving the Zinsmaster duplex.

Finally, Barron argues that the commission lacked authority to require it to remove its lines or "sell" them to NSP. Having determined that Barron's extension violated § 196.495(1m)(b), STATS., the commission ordered:

> 1. Within 60 days . . . [Barron] shall either remove its extension entirely or perform all of the following:

a. Disconnect its extension from [Barron]'s distribution line on 15th Avenue and from the northernmost transformer in Cooksville.

b. Remove that part of its extension through the Cranberry Flowage that is constructed overhead, if any. If this portion of the extension is underground it may remain in place, to avoid disturbing the Flowage further.

c. Transfer the remainder of the extension to NSP, at a price the parties agree upon and in a manner that protects the ratepayers in Cooksville from additional installation cost or service interruption.

■

Barron's argument does not mention § 196.495(5), STATS., which specifically directs the commission to "order the prompt removal" of any primary service extension violating the statute[15] —or § 196.495(6), which expressly states that cooperative associations are "subject to the authority of the commission to enforce the provisions of this section and to issue . . . orders relating to the provisions." In this case, the commission, in consideration of economic and environmental concerns, included an alternative to complete removal of Barron's line, and Barron has not persuaded us that such action is either unreasonable or unauthorized by law.[16] Because we have concluded the

[15] Section 196.495(5), STATS., states that, upon complaint of any interested party, "[i]f the commission determines that the primary voltage extension was made in violation of this section, it shall order the prompt removal of the primary voltage extension."

[16] Barron also argues that, at minimum, the commission lacks authority to order it to remove or sell that portion of the line providing service to the campers on Lot 15 or the security light, "all of which were connected and service provided 'prior' to

commission reasonably interpreted the antiduplication statute relevant to this case, we remand and direct the trial court to enter an order affirming the decision and order of the Public Service Commission dated March 5, 1996.

*By the Court.*—Order reversed and cause remanded with directions.

the extension of service to the [Zinsmaster] duplex." First, as NSP points out, while Barron might have connected service to Lot 15 and the light before it connected service to the duplex, it extended its line to the duplex prior to connecting Lot 15. Second, we have upheld the commission's ruling that neither the Lot 15 campers nor the security light were "principal buildings or facilities" within the meaning of § 196.495, STATS., and that, as a result, Barron's entire 5581-foot extension from 15th Avenue to the Zinsmaster duplex was an illegal primary extension. As indicated, § 196.495(5) directs the commission to "order the prompt removal" of such extensions.