Colecta MIRELES, Plaintiff-Respondent,†

v.

LABOR & INDUSTRY REVIEW COMMISSION, Defendant,

AMETEK-LAMB ELECTRIC and National Union Fire Insurance of Pittsburgh, Defendants-Appellants.

Court of Appeals

*No. 98–1607. Submitted on briefs February 1, 1999.—Decided March 24, 1999.*

(Also reported in 593 N.W.2d 859.)

†Petition to review granted.

53

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Douglas M. Feldman* and *Oyvind Wistrom* of *Lindner & Marsack, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *John A. Becker* of *Becker, French & DeMatthew* of Racine.

Before Snyder, P.J., Brown and Anderson, JJ.

BROWN, J.   This case is about worker's compensation loss of earning capacity benefits when an employee has suffered both scheduled and unscheduled injuries. The Department of Industry, Labor and Human Relations (the Department) found that the employee, Colecta Mireles, could not have her award reviewed based on loss of earning capacity because her disability stemmed from a scheduled injury. The Labor and Industry Review Commission (LIRC) upheld that decision. Mireles appealed to the circuit court, which reversed. Ametek-Lamb Electric and National Union Fire Insurance of Pittsburgh (Ametek) appeal from this reversal. Here, we conclude that the agency's decision that Mireles was not eligible for loss of earning benefits was reasonable and supported by substantial and credible evidence. We thus reverse the circuit court's decision.

55

The facts of this case are as follows. Mireles was employed by Ametek from 1988 to 1993. In April 1991, she injured her lower back while lifting a box of motors. She was taken off work for seven months, during which time she received temporary disability benefits. In November 1991, she returned to work only to suffer continued back pain. Her doctor permanently restricted her lifting to thirty pounds. Ametek accommodated this limitation by moving her to a different job. Mireles began the new position, taping motors, in August 1992. In October 1993, she developed pain and numbness in her hands. She was diagnosed with bilateral carpal tunnel syndrome and placed under permanent work restrictions of no repetitive work and no lifting over two pounds with her right hand. Because of these restrictions, Ametek had no work available for her. She was paid temporary disability wages for a year and then terminated. In March 1995, Mireles applied to the Department for loss of earning capacity benefits, pursuant to § 102.44(6)(b), STATS. The Department's refusal to award her those benefits is the subject of this appeal.

Before relating the procedural history of this case, we briefly discuss the statutory scheme at issue. Injuries causing a permanent disability fall into two categories under the Worker's Compensation Act (WCA). *See Langhus v. LIRC*, 206 Wis. 2d 494, 498–99, 557 N.W.2d 450, 453 (Ct. App. 1996). If the injury is "scheduled" under §§ 102.52, 102.53 or 102.55, STATS., benefits are calculated according to those sections. *See Langhus*, 206 Wis. 2d at 498, 557 N.W.2d at 453. The schedules generally address loss of extremities, hearing or sight, and partial impairment is compensated by a percentage award of the scheduled benefit. *See id.* at 498–99, 557 N.W.2d at 453. These benefits are the

exclusive compensation for scheduled injuries. *See id.* at 499–500, 557 N.W.2d at 453; § 102.44(4), STATS. If the injury is "unscheduled," meaning it is not dealt with under §§ 102.52, 102.53 or 102.55, then benefits are based on loss of earning capacity. *See Langhus,* 206 Wis. 2d at 499, 557 N.W.2d at 453. As with scheduled injuries, if the disability is less than total, the benefits award is adjusted to reflect the severity of the impairment. *See id.*; § 102.44(3). When an employee is able to return to work at more than 85% of the wage he or she earned at the time of the injury, loss of earning capacity will not be taken into account in determining the award. *See* § 102.44(6)(a). However, if the employment relationship is terminated or the worker suffers a wage loss of 15% or more, the Department may reopen an award and "make a redetermination taking into account loss of earning capacity." *See* § 102.44(6)(b). Keeping this scheme in mind, we now turn to the administrative path leading to this appeal.

As noted above, the Department declined to reopen Mireles' case to take into account loss of earning capacity. When Mireles appealed this decision, the administrative law judge concluded that Mireles was not eligible for loss of earning capacity benefits under § 102.44(6)(b), STATS. This is so, according to the ALJ, because Mireles' unscheduled injury was not the cause of her loss in earning capacity. After her back injury, she was able to return to work at the same wage. It was not until her carpal tunnel syndrome that she suffered a loss of earning capacity. The carpal tunnel syndrome is a scheduled injury, and § 102.44 does not apply to scheduled injuries. When § 102.44(6)(b) refers to physical limitations preventing continuation of employment, these limitations must be from an unscheduled injury in order for the statute to apply. Because Mireles' limi-

tations stemmed from her scheduled carpal tunnel syndrome, and not her unscheduled back injury, the Department could not revisit her award under § 102.44(6)(b). Mireles appealed this decision to LIRC, which upheld the ALJ's decision. LIRC agreed "with the employer that a logical interpretation of the language in sec. 102.44(6)(b) is that the limitations must stem from an unscheduled injury." The circuit court reversed LIRC's decision.

We first note that our review is of LIRC's decision, not the circuit court's. *See Langhus*, 206 Wis. 2d at 501, 557 N.W.2d 454.[1] LIRC's decision includes both factual findings and legal conclusions. We first discuss the fact questions and then turn to the legal issue.

With respect to the agency's factual determinations, we will uphold them as long as they are supported by the record. *See id.*; § 102.23(6), STATS. Our role upon review is to "search the record to locate credible evidence to support LIRC's factual findings." *Brakebush Bros., Inc. v. LIRC*, 210 Wis. 2d 623, 630, 563 N.W.2d 512, 516 (1997).

Here, there is some lingering dispute about the source of Mireles' inability to work. In her appellate brief, Mireles states that "[t]here is some issue of fact with respect to whether other jobs would have been available to Ms. Mireles if she did not have the back injury; however, that finding of fact was never made by

---

[1] Because we review LIRC's decision and not the circuit court's, we address our attention to those sections of the parties' briefs that focus on the reasoning behind the LIRC decision, despite the fact that the parties have framed their arguments in terms of the circuit court's conclusions.

the department." But, the ALJ stated that "[b]oth parties concede that the reason her return to work . . . was impossible is due to the restrictions with her hands." The record supports the conclusion that it was the wrist restrictions, not the back restrictions, that kept Mireles from being able to work. Ametek's personnel supervisor testified that it was impossible to accommodate Mireles' wrist restrictions, but that if she had had only the back injury she could have kept working. Indeed, after the back injury she was able to continue to work at the same wage. In a report prepared for Mireles' attorney, a vocational expert noted that because she returned to work after the back injury, "one would have to conclude that she was able to return to work at her previous level of earnings without any resulting loss of capacity." Thus, the finding that Mireles' inability to work was entirely attributable to her wrist restrictions is supported by substantial and credible evidence in the record. We will not overturn LIRC's resolution of this factual issue. *See id.* at 629–30, 563 N.W.2d at 515.

We now turn our attention to LIRC's legal conclusions. Interpreting a statute is a question of law, one we usually review de novo. *See Hagen v. LIRC*, 210 Wis. 2d 12, 18, 563 N.W.2d 454, 457 (1997). However, we will defer to an agency's interpretation under certain circumstances, depending on the level of expertise the agency has acquired in the area. *See Barron Elec. Coop. v. Public Serv. Comm'n,* 212 Wis. 2d 752, 760–64, 569 N.W.2d 726, 731–32 (Ct. App. 1997) (reviewing supreme court's discussion of standards of review of agency interpretations of statutes in *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 539 N.W.2d 98 (1995)).

■

Predictably, the parties disagree on the proper level of deference, if any, to be accorded the agency's interpretation. Ametek argues that great weight deference, in which we uphold an agency's interpretation as long as it is reasonable, is appropriate in this case. Mireles urges a de novo review. In choosing the appropriate standard of review, the factors to be considered are: (1) whether the agency is in charge of administering the statute in question, (2) whether the agency's interpretation is long-standing, (3) whether the agency's interpretation is a product of specialized knowledge or expertise, and (4) whether interpretation by the agency provides consistency and uniformity in the application of the statute. *See Id.*, at 760–61, 569 N.W.2d at 731.

■

We agree with Ametek that LIRC's interpretation of the statute is entitled to great weight deference. LIRC is in charge of reviewing worker's compensation cases and has expertise in that area. *See Langhus*, 206 Wis. 2d at 502, 557 N.W.2d at 454. In particular, "LIRC has consistently interpreted § 102.44 to require apportionment between scheduled and unscheduled injuries in analogous cases of permanent partial disability, and this interpretation has been upheld by the Wisconsin Supreme Court." *Langhus*, 206 Wis. 2d at 502, 557 N.W.2d at 454–55. The application of § 102.44, STATS., to a situation where an employee has suffered both scheduled and unscheduled injuries is precisely what this case is about. Thus, we review LIRC's decision with great weight deference and uphold it as long as it is reasonable. *See id.* at 503, 557 N.W.2d at 455.

LIRC concluded that Mireles was not entitled to a review of her award under § 102.44(6)(b), STATS.,

because that section only applies to unscheduled injuries and her loss of earning capacity was due entirely to her scheduled injury. That § 102.44 applies only to unscheduled injuries is well established. *See Langhus*, 206 Wis. 2d at 506, 557 N.W.2d at 456 (citing § 102.44(4) and *Mednicoff v. DILHR*, 54 Wis. 2d 7, 11–12, 194 N.W.2d 670, 672 (1972), for the long-standing mandate that "compensation for loss of earning capacity may not be awarded for scheduled injuries"). However, if a worker's disability is the result of both scheduled and unscheduled injuries, the schedule benefits are no longer exclusive. *See Hagen*, 210 Wis. 2d at 23, 563 N.W.2d at 459. But, in that situation, the worker must show the apportionment of his or her total disability between the scheduled and unscheduled injuries. *See Langhus*, 206 Wis. 2d at 504–05, 557 N.W.2d at 455–56.

In *Langhus*, the worker claimed permanent total disability due to a combination of an unscheduled back injury and a scheduled knee injury. *See id.* at 501, 557 N.W.2d at 454. Langhus twisted his left knee at work. *See id.* at 496, 557 N.W.2d at 452. His knee problems caused his gait to change, which led to back pain. *See id.* Langhus argued that he was eligible for loss of income under § 102.44(2), STATS., because part of his disability was attributable to his unscheduled back injury. *See Langhus*, 206 Wis. 2d at 506, 557 N.W.2d at 456. However, he failed to establish what portion of his disability was due to his back injury. *See id.* at 507, 557 N.W.2d at 456. Thus, the circuit court upheld LIRC's decision to deny loss of earning compensation. *See id.* at 508, 557 N.W.2d at 457; *see also Vande Zande v. DILHR*, 70 Wis. 2d 1086, 1091–93, 1096, 236 N.W.2d 255, 257–58 (1975) (upholding department's apportionment of benefits between scheduled hearing loss and

related unscheduled illnesses, all of which resulted from a single work injury).

Here, no apportionment of the disability between scheduled and unscheduled components was necessary because Mireles' inability to work at Ametek was entirely a result of her scheduled wrist injury. Unlike the injured worker in *Langhus*, Mireles' permanent total disability did not result from a combination of scheduled and unscheduled injuries. Mireles' termination was the result of the limitations placed on her by the carpal tunnel syndrome, not by her back injury. Had the restrictions been attributable to both injuries, Mireles could receive lost earning capacity benefits for whatever portion of her disability was due to her back injury, *see Vande Zande*, 70 Wis. 2d at 1091–92, 1096, 236 N.W.2d at 257–58, 260, provided she could establish apportionment between the two, *see Langhus*, 206 Wis. 2d at 505, 557 N.W.2d at 456.

Mireles argues that she is eligible for loss of earning capacity benefits under § 102.44(6)(b), STATS., because the restrictions due to the carpal tunnel syndrome "can be traced back to, and have some causal connection with the first unscheduled injury." She relies on *Western Lime & Cement Co. v. Industrial Commission*, 194 Wis. 606, 217 N.W. 303 (1928), and *Harnischfeger Corp. v. Industrial Commission*, 253 Wis. 613, 34 N.W.2d 678 (1948), for the proposition that she may recover for her subsequent wrist injury if it is causally connected to her back injury. Her theory is that but for the back injury she would not have had to switch jobs, and the wrist problems never would have developed. We reject this theory for three reasons: lack of factual connection, case law to the contrary, and the dichotomous scheme of the WCA.

First, LIRC found that Mireles' carpal tunnel syndrome was not causally connected to her back injury. We must accept the agency's factual findings unless they are not supported by credible and substantial evidence. *See* § 102.23(6), STATS. This finding is supported by the evidence. Mireles was restricted from repetitive hand movements and from lifting more than two pounds with her right hand. This precluded her from any employment at Ametek. Thus, her disability was entirely due to her wrist injury, a scheduled injury, and she was therefore not eligible for lost earning capacity benefits under § 102.44(6)(b), STATS.

Second, case law does not support Mireles' contention that a "but for" connection between her work restrictions, new job and second injury allows her to piggyback her later scheduled injury to her earlier unscheduled injury. The cases she cites, *Harnischfeger* and *Western Lime*, both involve workers who were injured at work and then suffered further injuries. *See Harnischfeger*, 253 Wis. at 614, 34 N.W.2d at 678; *Western Lime*, 194 Wis. at 607, 217 N.W. at 303–04. In order for the later injuries to be compensable, they had to be proximately caused by the work injuries. *See Western Lime*, 194 Wis. at 608, 217 N.W. at 304; *Harnischfeger*, 253 Wis. at 616, 34 N.W.2d at 679. The cases are distinguishable from Mireles' case in at least two respects. In *Harnischfeger* and *Western Lime*, there was a clear causal connection between the injuries. *See Harnischfeger*, 253 Wis. at 616, 34 N.W.2d at 679 (crushing leg injury at work led to fractures in that same leg later on); *Western Lime*, 194 Wis. at 608–09, 217 N.W. at 304 (muscles of injured leg gave way causing fall and further leg injury). Neither case involved a causation theory related to Mireles' "but for" test. Furthermore, neither *Harnischfeger* nor *Western Lime*

discusses the attribution of disability to scheduled versus unscheduled injuries; the issue in those cases was whether nonwork injuries were sufficiently connected to work injuries to be compensable under the WCA.[2] Finally, *Langhus* goes against Mireles' test. As discussed above, the worker in *Langhus* had both unscheduled and scheduled injuries. *See Langhus*, 206 Wis. 2d at 501, 557 N.W.2d at 454. In fact, Langhus' unscheduled injury appears to have arisen out of his scheduled injury. *See id.* at 497, 557 N.W.2d at 452 ("a physician noted that Langhus' gait had changed *due to his knee problem, resulting in back pain*" (emphasis added)). Mireles attempts to distinguish *Langhus* by pointing out that *Langhus* suffered a scheduled and then unscheduled injury, while her unscheduled injury came first. This is a distinction without a difference. In *Langhus*, we required apportionment between the two injuries, despite the fact that the second could be traced back to the first in a much more direct way than in Mireles' case. Certainly if apportionment was required there, it is required here. Neither *Langhus* nor the causal connection cases help Mireles.

Third, the rule Mireles urges would undermine the policy choice made in the WCA that compensation of scheduled injuries is limited to the scheduled amount. *See id.* at 499–500, 557 N.W.2d at 453; § 102.44, STATS. A "but for" test would allow an injured worker to collect loss of earning capacity benefits whenever a scheduled injury develops due to new work duties assigned to accommodate an initial unscheduled injury. In every

---

[2] The concept of a scheduled injury did exist at the time of *Harnischfeger Corp. v. Industrial Commission*, 253 Wis. 613, 34 N.W.2d 678 (1948), *see* § 102.52, STATS., 1947, and *Western Lime & Cement Co. v. Industrial Commission*, 194 Wis. 606, 217 N.W. 303 (1928), *see* § 102.09(5), STATS., 1927.

case like this one, where a work-related scheduled injury follows on the heels of a reassignment, the whole schedule concept would be rendered meaningless. We are not wont to construe the WCA in such a manner as to undo developed case law and the words of the statute itself.

*By the Court.*—Judgment reversed.