Kelly BROWN, Plaintiff-Appellant,

v.

LABOR AND INDUSTRY REVIEW COMMISSION, Schultz
Sav-o-Racine, and Reliance Insurance Company,
Defendants-Respondents.†

Court of Appeals

*No. 02–1429. Submitted on briefs December 12, 2002.—Decided
February 12, 2003.*

2003 WI App 56

(Also reported in 659 N.W.2d 918.)

† Petition to review granted.

788

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *John A. Becker* and *Thomas W. Durkin* of *Becker, French and DeMatthew* of Racine.

On behalf of the defendant-respondent Labor and Industry Review Commission, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Lowell E. Nass*, assistant attorney general.

On behalf of the defendants-respondents Schultz Sav-o-Racine and Reliance Insurance Company, the cause was submitted on the brief of *Michael S. Frohman* of *Kasdorf, Lewis & Swietlik S.C.* of Milwaukee.

Before Nettesheim, P.J., Brown and Snyder, JJ.

¶ 1. BROWN, J. Kelly Brown appeals from a circuit court order affirming an order of the Labor and Industry Review Commission (LIRC), which held that Reliance Insurance Company had not acted in bad faith pursuant to WIS. STAT. § 102.18(1)(bp) (1999–2000),[1] and WIS. ADMIN. CODE § DWD 80.70(2) when it discontinued payment on Brown's temporary total disability benefits prior to the termination of his healing period. We conclude that Reliance failed to properly investigate and develop the facts necessary to evaluate Brown's claim and, as a result, had no reasonable basis for terminating Brown's benefits. We also conclude that LIRC misapplied the law of bad faith to the facts of this case. We therefore hold that LIRC's conclusion that Reliance did not violate § 102.18(1)(bp) and § DWD

---

[1] All references to the Wisconsin Statutes are to the 1999–2000 version unless otherwise noted.

80.70(2) is unreasonable and reverse the order of the circuit court and remand the cause to the circuit court for remand to LIRC.

¶ 2. The relevant facts are as follows. In 1993, Brown, a butcher at a grocery store owned by Schultz Sav-o-Racine, suffered a compensable back injury while lifting items at work. Brown continued working while under the treatment of a physician. In April 1995, Brown reinjured himself and this time he could not return to work. Brown underwent surgery in August 1995 and Schultz and Reliance concede that his healing period continued through August 1996, when Brown's doctor gave him permission to return to work.

¶ 3. Schultz began temporary total disability (TTD) benefit payments on April 6, 1995. In October 1995, an employee of the Worker's Compensation Division Fraud Investigation Unit received an anonymous phone call. The caller indicated that Brown was working full time selling insurance while on worker's compensation and was bragging about it. The employee informed Reliance about the call. John Thome, an employee at a claims adjusting agency, assumed responsibility for the claim of fraud.

¶ 4. Thome contacted Brown's supervisor at the grocery store, who informed him that he had heard from the meat department workers that Brown was selling insurance and did not plan to return to work as a butcher. Thome then hired a private investigation firm to conduct surveillance on Brown. In December 1995, the investigation firm conducted surveillance of Brown and produced a narrative report describing the findings of its investigation. The report indicated that Brown was seen dressed in a business suit on a weekday and that he had been a licensed insurance agent since October 1994. The investigation firm also provided a

videotape that showed Brown dressed in a business suit and carrying a box into a day-care facility in the middle of the week and then leaving carrying an empty box.

¶ 5. On January 26, 1996, Schultz suspended payments of Brown's TTD benefits and a flurry of correspondence between the parties ensued. On February 1, Thome sent a letter to Brown indicating that the TTD benefits were being discontinued because Brown was violating his doctor's restrictions and Brown had not reported to Reliance the outside income from his insurance business, which could be used to offset some of the TTD benefits owed. Brown sent Thome a letter dated February 6, explaining that while he had a business, it had yet to show a profit. On February 16, Brown filed a request for a worker's compensation hearing. On February 20, Thome sent Brown a letter requesting Brown's attorney to supply documentation from Brown's business showing that he was not making a profit. Brown responded in a letter dated February 22, alleging that Thome's conduct constituted bad faith and advising Thome that he would be willing to provide Thome with any documentation Thome requested.

¶ 6. In November 1996, a hearing was held before an administrative law judge to determine Brown's eligibility for TTD benefits. At the hearing, Brown responded to questions concerning the income he had earned and the expenses he had incurred as an insurance agent. However, at the conclusion of the hearing, Schultz and Reliance could not provide the administrative law judge with the amount of the offset it was asking the judge to apply. The administrative law judge concluded that Schultz and Reliance had failed to meet their burden of proof of showing any income, which would form the basis for reduction of the stipulated

period of TTD, and ordered a payment of the additional TTD. Schultz and Reliance appealed and LIRC affirmed.

¶ 7. Brown then filed a claim for a penalty award pursuant to Wis. Stat. § 102.18(1)(bp), alleging that Reliance had acted in bad faith when it terminated his TTD benefit payments. At a hearing before an administrative law judge in March 2001, Thome testified that he terminated Brown's benefits as of January 26, 1996, in spite of the fact that he had not asked Brown if he was working or how much money he was making as an insurance salesman. He testified that he had not attempted to secure information regarding Brown's earnings up to that point in time. The administrative law judge concluded that Reliance had a reasonable basis for terminating Brown's TTD benefits when it did and dismissed Brown's bad faith claim. Brown appealed and LIRC affirmed and adopted as its own, with certain modifications, the findings and order of the administrative law judge. In its order, LIRC explained the reasons for its decision:

> There are a number of reasons for my decision. First, the respondent received word from the state of Wisconsin that the applicant might have been involved in insurance fraud. There are fraud provisions in the Worker's Compensation statute to protect the employer, the insurance carrier and the system itself. Second, the insurance carrier then received word from the employer that the applicant indicated he was going to sell insurance on a full time basis and would not return to work. Even though the applicant had sold insurance on a part time basis before, it appears that he was making this a full time occupation and therefore the insurance carrier may have been entitled to an offset. Third, the insurance carrier did not cut off benefits at that time. They hired a surveillance company to determine if the

795

applicant was indeed selling insurance on a full time basis . . . . The report noted that applicant had been an independent insurance agent since October 1994 selling products for a number of companies. The applicant had an agent license number with the state. Fourth, it wasn't until after these three factors were known that the carrier sent their letter of February 1, 1996. In that letter they indicated that their investigation showed that the applicant may be working outside his restrictions and was performing additional work. In that letter they clearly were seeking wage information so that they could receive credit against that paid. It appears that they had sufficient information to initially cut off benefits at that time. Fifth, it appears that the full matter could have been taken care of relatively easily if the applicant would have simply provided detailed wage information at that time. No information was provided regarding income earned during the 1996 temporary total disability period. The respondent was unable to get wage information from the applicant or World Marketing Alliance. When the applicant failed to provide wage information in February 1996 he was simply re-enforcing the respondent's beliefs that he was working full time. Finally, a section on fraud was placed in the Worker's Compensation Act to prevent fraud on the system. There is a realization that if fraud is involved, and the temporary disability money is paid under mistake of fact, there is no way of getting it back from the person who committed the fraud. (Emphasis omitted).

The circuit court affirmed LIRC's findings of fact and conclusions of law and Brown now appeals.

██

¶ 8. WISCONSIN STAT. § 102.18(1)(bp) and WIS. ADMIN. CODE § DWD 80.70(2) set forth the procedure for assessing a claim of bad faith. Section 102.18(1)(bp) provides, in pertinent part, that the "department may

include a penalty in an award to an employee if it determines that the employer's or insurance carrier's suspension of, termination of or failure to make payments or failure to report injury resulted from malice or bad faith." Pursuant to the power conferred by the last clause of § 102.18(1)(bp), LIRC promulgated § DWD 80.70(2), which defines bad faith and malice as follows:

> An insurance company or self-insured employer who, without credible evidence which demonstrates that the claim for the payments is fairly debatable, unreasonably fails to make payments of compensation or reasonable and necessary medical expenses, or after having commenced those payments, unreasonably suspends or terminates them, shall be deemed to have acted with malice or in bad faith.

Therefore, an insurance company is deemed to have acted in bad faith and must pay a penalty if it unreasonably fails to make payments of compensation without credible evidence which demonstrates that the claim for payment is "fairly debatable."

¶ 9. The question of whether Reliance's actions constitute bad faith pursuant to WIS. STAT. § 102.18(1)(bp) and WIS. ADMIN. CODE § DWD 80.70(2) presents a mixed question of law and fact. *Kimberly-Clark Corp. v. LIRC*, 138 Wis. 2d 58, 66, 405 N.W.2d 684 (Ct. App. 1987). The conduct of the parties presents a question of fact and the meaning of the statutes is a question of law. *Applied Plastics, Inc. v. LIRC*, 121 Wis. 2d 271, 276, 359 N.W.2d 168 (Ct. App. 1984). Whether the facts fulfill a particular legal standard is also a question of law. *See id.* It is axiomatic that an agency's findings of fact are conclusive on appeal so long as they are supported by substantial and credible evidence and

that any legal conclusion drawn by the agency from its findings of fact is subject to judicial review. *Nottelson v. DILHR*, 94 Wis. 2d 106, 114–15, 287 N.W.2d 763 (1980).

¶ 10. While we have often repeated the proposition that the interpretation of statutes and their application to found facts is a question of law for the courts, not for administrative agencies, an equally important principle of administrative law is that, in recognition of the expertise and experience possessed by agencies, courts will defer to their interpretation and application of statutes in certain situations. *Barron Elec. Coop. v. PSC*, 212 Wis. 2d 752, 760, 569 N.W.2d 726 (Ct. App. 1997). Where a legal question calls for value and policy judgments that tap into the expertise and experience of the agency, as is the case here, the agency's decision, although not controlling, is given great deference. *See Kimberly-Clark*, 138 Wis. 2d at 64. LIRC has developed extensive experience and expertise in applying the law of bad faith and the criteria for determining when a claim is "fairly debatable" as articulated in the statutes and case law, and its decisions on such matters should be given great weight on review. We will thus defer to LIRC's legal conclusions if they are found to be reasonable, even if we would not have reached the same conclusions. *See Nigbor v. DILHR*, 120 Wis. 2d 375, 384, 355 N.W.2d 532 (1984). Bearing this deferential standard of review in mind, we turn to Brown's claim that Reliance acted in bad faith when it terminated his TTD benefits.

¶ 11. Brown claims that when Reliance terminated his benefits it did not have credible evidence demonstrating that his claim was "fairly debatable" as that term has been defined in the law. He argues that Reliance failed to properly investigate his claim. He

contends that Reliance had never asked for any information from Brown and had no proof that Brown earned any money as an insurance salesman and thus did not have a reasonable basis for terminating his benefits.

¶ 12. In *Kimberly-Clark*, we set forth the test for determining whether a claim is "fairly debatable" pursuant to WIS. STAT. § 102.18(1)(bp) and WIS. ADMIN. CODE § DWD 80.70(2). *Kimberly-Clark*, 138 Wis. 2d at 65–66. In order to demonstrate a claim for bad faith, a claimant must show the absence of a reasonable basis for denying benefits of the policy and the defendant's knowledge or reckless disregard of the lack of a reasonable basis for denying the claim. *Id*. at 65.

¶ 13. Thus, before an insurance company terminates a claimant's benefits it must have a reasonable basis for doing so; it must have some information that would lead a reasonable insurer to conclude that it need not make payment on the claim—i.e., something making the claim fairly debatable. *Id*. at 64. In deciding whether the employer's or insurer's actions are reasonable, it is necessary to determine whether the claim was properly investigated and if the results of the investigation were subject to a reasonable evaluation and review. *Id*. at 65. This determination must be based on information or data the insurer had in its possession at the time the claim for benefits was denied and on how that information was used. *Id*. at 65–66.

¶ 14. Here, upon receiving word of the anonymous call to the fraud investigation unit in October 1995 indicating that Brown was working as an insurance agent, Reliance proceeded to contact Brown's

supervisor and to hire a private firm to conduct surveillance on Brown's activities. Brown's supervisor informed Reliance that he had heard that Brown was planning to sell insurance on a full-time basis and would not return to work. The private firm noted in its report that Brown had been a licensed independent insurance agent since 1994. Based on this information, on January 26, 1996, Reliance discontinued payment on Brown's TTD benefits. On February 1, Reliance sent Brown a letter informing him that Reliance was discontinuing his benefits because its investigation indicated both that he was violating his doctor's restrictions and that he was currently employed and had not reported any income.[2] LIRC concluded that at this time Reliance had sufficient information to withhold Brown's benefits, reasoning that Reliance's investigation had provided it with a reasonable basis for believing that Brown was engaged in wage-earning services.

¶ 15. While Reliance did follow up on the call to the fraud line, its preliminary investigation only revealed that Brown was licensed and possibly planned to work as an insurance agent full time. However, merely knowing that Brown might be working is not a sufficient justification for terminating his benefits. As Brown points out, in order for Reliance to be entitled to an offset on its payments, it would need information

---

[2] Thome later testified that although he had stated in the letter that Reliance was terminating Brown's benefits because Brown was in violation of his doctor's restrictions, the sole basis for discontinuing payment on Brown's benefits was the fact that Brown was working another job.

establishing that Brown was earning a profit as an insurance salesman during the time he was receiving benefits.[3]

██

¶ 16. When Reliance terminated Brown's benefits, it did so without having obtained any information indicating that Brown was earning a profit at all. Reliance had never even contacted Brown to request that he provide it with documentation of his reportable income. Thome testified to these facts at the bad faith hearing. He testified that he wrote the letter on February 1, which accused Brown of making a profit, without knowing Brown was earning any reportable income that would entitle Reliance to an offset and without having taken any steps to secure such information from Brown. Thus, at the time Reliance terminated Brown's benefits, it had no reasonable basis for believing that it would be entitled to any offset, much less the offset it took—the entire amount of Brown's salary as a butcher.

██

¶ 17. Whether a claim is "fairly debatable" implicates the question of whether the facts necessary to evaluate the claim are properly investigated and developed or recklessly ignored and disregarded. *Id.* at 69. The record demonstrates that Reliance's limited investigation did not provide it with any information that

---

[3] As LIRC explained in its order requiring Reliance and Schultz to pay Brown the additional TTD benefits:

> If an applicant is able to work and earn wages while he is still healing from his work injury, the wages are applied against the applicant's temporary total disability rate according to a proportional formula. WIS. STAT. § 102.43(2). In cases of self-employment, the commission usually bases the proportional reduction on pretax earnings (revenues minus expenses) from the self-employment. (Citations omitted.)

could have possibly led it to conclude that it need not make payment on Brown's claim, and as is evidenced by Thome's testimony, it knew as much when it discontinued Brown's benefits. Had Reliance at least attempted to contact Brown or otherwise obtain income information prior to withholding payment, the outcome of this case may have been quite different. However, in the absence of a proper investigation and under the facts of this case, we hold that Brown's entitlement to a continuation of his benefits was not rendered "fairly debatable" within the meaning of the law.

¶ 18. LIRC concluded, and Reliance now asserts on appeal, that in its February 1 letter, Reliance was clearly seeking wage information from Brown and that because Brown failed to provide it with detailed income information, Brown simply reinforced Reliance's reasonable belief that he was engaged in wage-earning services.[4] The law, however, is not that a worker's

---

[4] The text of the letter in its entirety reads:

We received a medical report from your treating physician dated 1/23/96. This report indicated you were limited in your activity. Based on Dr. Flatley's restrictions you are not able to bend, lift or push. Our investigation indicates you are violating your doctors restrictions. In addition our investigation indicates you are currently employed and you have not reported any income to our office so that we could calculate the offset due.

Based on this lack of income information we are discontinuing disability benefits.

Because we conclude that the law does not permit Reliance to terminate Brown's benefits and then conduct an inquiry into its entitlement to an offset, we need not address Reliance's argument, and LIRC's conclusion, that the letter represents a request for detailed wage information. We do say, however, that nowhere in the letter does Reliance actually ask Brown to

802

compensation insurance carrier can "shoot first and ask questions later." First, by February 1, the actions constituting bad faith had already occurred. As we previously discussed, Reliance had already terminated Brown's benefits without having a reasonable basis for doing so. It was not until after discontinuing payment on his benefits that Reliance purportedly began its investigation into whether Brown earned a profit. Further, Reliance acknowledged at the bad faith hearing that it thought an offset was an affirmative defense. To allow Reliance to first terminate Brown's benefits and then require Brown to prove that he is not earning a profit improperly shifts to Brown the burden of disproving Reliance's entitlement to an offset. Finally, it is well settled that the basic purpose of the Worker's Compensation Act is to give prompt relief to injured employees who are entitled to compensation and it must be liberally construed to effectuate that policy. *Nigbor*, 120 Wis. 2d at 382.

provide it with documentation of the wages he earned as an insurance salesman. The letter merely informs him that his benefits were being terminated because he was exceeding his doctor's restrictions, which Thome later testified was not the basis for the termination, and accuses Brown of earning income that he was not reporting. We realize that if there is "substantial and credible" evidence, a low standard, the facts found by LIRC are conclusive. Here, however, there is *no* evidence whatsoever that the letter from Reliance asked Brown to provide documentation and no reasonable person would read the letter and have implicitly understood there to be such a request. We also note that on February 6, Brown did respond with a letter advising the company that he was not earning a profit as an insurance salesman and requesting that it provide him with a basis for its assertions.

803

¶ 19. Reliance argues that given our deferential standard of review, we must uphold LIRC's determination that Reliance had a reasonable basis for discontinuing Brown's benefits and thus it did not act in bad faith. However, as we observed earlier, LIRC's decision, while entitled to great deference, is not controlling. We will sustain an agency's decision as long as it is reasonable. An agency's interpretation and application of a statute are reasonable if they accord with the language of the statute, the statute's legislative history, and the legislative intent; if the interpretation and application are consistent with the constitution, the statute read as a whole, and the purpose of the statute; and if the interpretation and application are consistent with the judicial analysis of the statute. *Barron Elec. Coop.*, 212 Wis. 2d at 766. LIRC's interpretation and application of WIS. STAT. § 102.18(1)(bp) and WIS. ADMIN. CODE § DWD 80.70(2) are inconsistent with our own interpretation and application of the term "fairly debatable" as set forth in *Kimberly-Clark* and directly contravene the basic purpose behind the Worker's Compensation Act. For these reasons, we hold that LIRC's determination was unreasonable and we reverse and remand to the circuit court for remand to LIRC for a determination of the amount of the penalty award.

*By the Court.*—Order reversed and cause remanded with directions.